### In re GLOBAL INTERNATIONAL AIRWAYS, Debtor.

**Bankruptcy No. 83–02765–2–11.**

United States Bankruptcy Court, W.D. Missouri.

Dec. 14, 1983.

Alex M. Lewandowski, Reeder, Griffin, Dysart, Taylor & Penner, Kansas City, Mo., for debtor.

Ronald C. Spradley, Ronald S. Weiss, Paul E. Berman, Kansas City, Mo., for creditor.

## MEMORANDUM OPINION AND ORDER

JOEL PELOFSKY, Bankruptcy Judge.

After two days of hearings the Court took under advisement the Motion by the Debtor to Assume a purported Lease with Air Canada and asking the Court, in addi-

tion to other relief, to direct Air Canada to surrender the aircraft to it for its use commencing December 18, 1983. The Court has considered arguments of counsel, the briefs that have been filed, the posture of the lessor, Air Canada, appearing specially, and enters the following ORDER:

The evidence shows that on June 1st, 1983, the Debtor and Air Canada entered into a one-year lease agreement for a Boeing 747–133, Canadian registration CFTOA, manufacturers number 20013.

In general terms the lease provided that the Debtor would pay to Air Canada the sum of $205,000 a month, net of taxes, and that Debtor would provide a letter of credit up to One-Half Million Dollars for faithful performance. The Debtor also was obligated to provide insurance. Among other things the lease provided was that the Debtor would be entitled to fly the aircraft any place where U.S. air carriers may lawfully operate. Paragraph 5.11.

In Paragraph 8.1 of the lease the lessor stated that the lease constitutes a "legal, valid, and binding obligation of lessor in accordance with the terms hereof" and made reference to the fact that there was no legal hinderance to the lessor entering into this lease, except for certain consents it would obtain on or prior to delivery. There is no reference in the lease that it is conditioned upon approval by the Ministry of Transport of the Canadian government.

Paragraph 17.1 provides that the lease may be terminated upon ninety (90) days notice. In Paragraph 19.1 the lease provides New York law governs. In Paragraph 22.1 the lease provides it may be amended only in writing.

On the same day the parties entered into a technical service agreement which was to be governed by Ontario law providing that the Debtor would pay to Air Canada the sum of $1,250 per flight hour for maintenance. There was guaranteed a minimum of 2,400 flight hours of maintenance per year. There is a provision in the technical service agreement that the parties agree to renegotiate the rate. The technical service agreement requires a letter of credit of $500,000 and provides if the letter of credit is drawn upon, it must be replenished.

The evidence further shows that on August the 29th, the Debtor sent to Air Canada, Mr. O'Keefe, to be precise, a telegram, called in the evidence a SITA, which declared it intended to return the airplane because it was not economical to use, and asked for ten different adjustments to the lease, including adjustments to both the lease rate and the technical service rate.

On August 30th, Air Canada made a reply. On September the 6th Air Canada made a second reply correcting the first reply and proposed a lease rate of $185,000 a month plus a technical services rate of $1,100 a month and a guaranteed minimum of 2,000 maintenance hours.

The second telegram also requested face-to-face meetings to detail certain aspects of the amendments and stated at the end of the telex that Air Canada contemplated making amendments to the lease which would incorporate these various changes.

There was a message on September the 14th to the effect that the parties would meet on September the 19th in Kansas City. That meeting occurred. On September 22, 1983, Air Canada advised the Debtor that it had heard about airplanes being seized or the possibility of seizure in Europe and expressed concern about the vulnerability of the 747, which at that time was in the possession of the Debtor.

There is no evidence that in the meeting of September the 19th through the 21st that all of the terms of any amendment were resolved. There was negotiation on the various aspects of the problems detailed in the earlier telegrams.

On September the 27th there was a writing executed by the Debtor and Air Canada in which the parties agreed that the lease would be suspended from October the 1st until December the 15th and various terms and conditions were set out. Some of those were that there was to be a payment of $307,000 on September 29th and that on October 3rd the aircraft would be returned. The letter agreement also contained a pro-

vision that by November the 14th the parties would either agree to the handling of the amounts then in default or the Debtor would pay all of the arrearages. On October the 5th the 747 was returned to Air Canada.

There was a meeting on or about October the 15th in which the Debtor advised Air Canada that it intended to file bankruptcy in the next few days. The testimony of the Debtor, although vigorously disputed in argument by counsel on behalf of Air Canada, was to the effect that in that meeting agreement was reached on the rate reductions and all the other aspects of concern to the debtor. The results of the October 17th meeting were not reduced to writing.

On November the 15th the Debtor advised Air Canada that it wanted to use the 747 for certain flights chartered by the United States Military Academy from New York State to California. The airplane was not delivered by Air Canada to the Debtor.

At the close of the evidence, Air Canada raised several points urging the Court to deny the assumption. Many of these points had been raised throughout the proceedings and were simply reiterated at that time. There are several questions which the Court must resolve in order to rule this issue.

The first two are concerned with jurisdiction. The Court will deal first with the matter of subject matter jurisdiction. Under Section 365 of the Bankruptcy Code the trustee may assume, subject to the Court's approval, an executory agreement.

■ There are conditions. The Debtor must cure or provide adequate assurance of prompt cure. The Debtor must compensate or provide adequate assurance to third parties for actual loss and must provide assurance of future performance.

Under Rule 6006 of the Rules of Bankruptcy Procedure, a motion to assume an executory agreement is a contested matter under Rule 9014. Rule 9014 provides that the other party to the agreement must have reasonable notice and opportunity to be heard. The rule also provides no response is required unless the Court so orders and provides further that the motion must be served in the manner provided in the service of the complaint by Rule 7004.

■ The law is very clear that a proceeding to assume an executory agreement is a core matter in bankruptcy. The interim rule makes no reference to such a proceeding because the interim rule deals with the distribution of jurisdiction between related and unrelated matters. The interim rule refers to the fact that a related matter is a matter that could have been brought in a State Court or a District Court of the United States absent bankruptcy. An action to assume an executory agreement cannot be brought in any court except bankruptcy. Relief of this nature can only be sought in a bankruptcy proceeding. *Matter of Minges,* 602 F.2d 38 (2nd Cir.1979); *Matter of McLouth Steel Corp.,* 20 B.R. 688 (Bkrtcy.E. D.Mich.1982). This Circuit has held that the Interim Rule is constitutional. *In re Hansen,* 702 F.2d 728 (8th Cir.1983).

■ The Court concludes, therefore, that it has subject matter jurisdiction of the assumption of the executory agreement.

The question now rises and is vigorously argued by counsel for Air Canada, appearing specially, that the Court has no jurisdiction over Air Canada. While there is no direct proof, there is an affidavit to the effect that Air Canada is an instrumentality of the Government of Canada, a foreign state. For purposes of this hearing, the Court does not make such a finding, but assumes it is so.

The jurisdiction over a foreign state in the courts of the United States is covered by a portion of Title 28 entitled Jurisdictional Immunities of Foreign States. The statutes set out certain circumstances under which a foreign state may be subject to the jurisdiction of courts of the United States.

Section 1605(a)(2) provides that a foreign state shall not be immune from the jurisdiction of courts of the United States or the states in any case in which the action is based upon a commercial activity carried on in the United States by a foreign state.

Section 1603 defines a commercial activity as a regular course of commercial conduct or a particular commercial transaction or act, and the commercial character of the activity shall be determined by the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

■ The Court finds that by entering into a contract governed by the laws of the State of New York and by conducting airline activities in the continental United States, Air Canada does conduct commercial activities in the United States within the meaning of Section 1605(a)(2). *Verlinden B.V. v. Central Bank of Nigeria,* —— U.S. ——, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *Texas Trading v. Federal Republic of Nigeria,* 647 F.2d 300 (2nd Cir.1981); *Gemini Shipping v. Foreign Trade Organization,* 647 F.2d 317 (2nd Cir.1981). Those cases clearly support a finding that, for purposes of this particular proceeding, Air Canada is subject to this Court's jurisdiction.

There next arises the question of whether there has been service of process. After a series of tortured efforts, there isn't any question that the Debtor was able to serve a managing agent of the Air Canada Chicago operation. And while there is some confusion as to what precisely was served, the Court concludes that all of the documents necessary for service of a motion under Bankruptcy Rule 9014 were served upon the managing agent.

■ The problem then becomes whether there was due process, that is, giving Air Canada, within the language of Rule 9014, reasonable notice and opportunity to be heard.

The motion was filed on the 28th of November. At that time a copy was handed to one of Air Canada's counsel for informational purposes, with the express stipulation that acceptance was not an entry of appearance.

In the latter part of the week prior to the hearing, copies of these various pleadings were served on persons who had relationships with Air Canada, although not for purposes of attachment of jurisdiction.

Counsel who appeared here on December 5, 1983 were given copies of these documents at least by December 2, 1983 and were advised by the Court that should they desire further testimony or the opportunity for testimony, that such opportunity would be afforded to them on Tuesday, December the 13th.

The Court notes, for the record, after two days of hearings, that it was apparent that counsel were well acquainted with the issues and were able to vigorously protect the interests of their client, even though they appeared only specially.

The Court also notes that counsel could have presented testimony in the proceedings on Monday and Tuesday, December 5th and 6th, but chose not to bring any of their witnesses, even though the Court had indicated it would honor a special appearance.

In *Texas Trading,* supra, at 308, the Court set out five criteria which enable the Court to determine whether there is, in fact, personal jurisdiction.

This Court concludes that four of those may be answered affirmatively and the fifth, which raises the question of due process, could if necessary, be answered affirmatively after any hearing that the Court had on Tuesday, December 13th.

The Court concludes, therefore, it has personal jurisdiction or could have for all purposes over Air Canada no later than Tuesday of next week.

■ The question then arises as to whether there is a lease to be assumed. Air Canada does contend, although not by pleadings, that the lease had been terminated by the actions of the Debtor indicating that it intended to surrender the airplane in November.

The Court finds, in fact, that there was no reliance upon that notice and that the parties, after the notice was sent, proceeded to make attempts to renegotiate a new arrangement.

Therefore, the Court finds that the lease was not terminated and the lease of June 1st, 1983, and the technical service agreement of June 1st, 1983, are still in effect.

■ The question then arises as to whether there is a modified lease and a modified technical service agreement. The point is vigorously debated. The court concludes after reviewing various authorities presented by the parties that even under New York law, which has a statute (GOL 15–301) preventing the modification of written agreements by oral agreements, the parties may amend orally a written agreement.

The New York courts say the doctrine is well established that even where a contract provides there shall be no waiver or amendment not eveidenced by writing, the provision against oral waiver may itself be waived. *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 122 N.E. 378 (1919); *Neonex Intl. Ltd. v. Norris Grain Co.,* 338 F.Supp. 845, 853 (D.C.S.D.N.Y.1972); *Grandonico v. Consortium Con. Intl., Inc.,* 566 F.Supp. 1288, 1291 (D.C.S.D.N.Y.1983).

In order to avoid the effect of the statute, there must be evidence of estoppel on the part of the parties seeking protection or an act on the other party in reliance on the oral modification. *Savage is Loose Co. v. United Artists,* 413 F.Supp. 555, 559 (D.C.S.D.N.Y.1976). The Court does not find there was any act in reliance on the oral modification. The oral modification which was finally agreed to occurred on October the 17th, and the Debtor took no action thereafter in reliance upon any agreement obtained in that meeting. To the contrary, the evidence shows that in entering into the Global-Carefree charter arrangement, the Debtor relied upon a telegram sent by Air Canada in early September of 1983 indicating that it would accept $185,000 a month and $1,100 a flight hour maintenance charge.

The Court finds, for purpose of this pending Order, that there may have been agreement on October 17th, but no action in reliance upon that agreement. The Global-Carefree arrangement was entered into September the 9th and has not yet been performed. The Court does hold that the lease agreement, even under New York law, may be orally modified and may well have been.

The question remains whether or not the statute of frauds bars that oral agreement. There are several memorandum, even though they were prior to the actual agreement, which may well take the lease, if amended, out of the statute of Frauds. The Court is not going to rule that particular issue for reasons hereinafter set, which moot the issue at this time.

■ The final question is whether Global can assume this agreement. Assumption requires Court approval. The principal test is that the assumption must be in the exercise of a sound business judgment showing benefit to the Debtor.

The Court has made an extensive analysis of what data is available. Testimony was that Global anticipated a 7% net profit against the Carefree Vacation business. The gross amount of the Carefree contract was 7½ Million Dollars. The projections that the Debtor made as to the volume of business that was going to be done with Carefree did not take into consideration any contingencies that might result from the failure of the charter to book fully or to fly any of the trips.

And while there is testimony that there was a substantial amount of seats sold, some 5,000 so far for the four months, there was no computation as to the number of seats totally available for all the charters through the end of April, and no showing by the Debtor that, in fact, all of the contingencies had been fully considered.

One that was brought out that is particularly significant is the fact that if the 747 is unable to fly a trip, it will take at least 2½ other aircraft—obviously, that means 3—to service the same run, at some significant increase in expense.

Based upon the projections that had been presented and working the figures both from the original lease documents and also

from the contentions of the parties as to what was the agreement and what was in arrears, the Court comes up with the following cost figures that must come out of this activity in order for the Debtor to operate, pay the lease to Air Canada, and cure the defaults.

First, assuming that the lease has not been modified orally, the total rent for the three months of operation, that is to say December, January and February, without any adjustment for the middle of the month start, is $716,000. The minimum maintenance is $750,000.

There isn't any question that the letter of credit issued by the Abu Dhabi Bank has been drawn down upon and must be replenished, in the amount of Half Million Dollars.

There was testimony that the insurance for the 747 was $60,000 a month. The Court finds nothing besides Mr. Azima's testimony that that is the correct figure. The projections show that the insurance is $60,000 in gross, and the Court, therefore, assumes by making some comparisons with earlier figures that the amount of insurance for the 747 on a monthly basis is $8,000. That may not be correct, but it's the only figure that makes any sense. In light of the documentation presented to the Court, that creates a $24,000 charge.

The creditor, Air Canada, contends there is a Million Dollars in default in addition the Half Million Dollars that is owed to the Abu Dhabi Bank. That is hotly disputed but, nonetheless, adding up all those figures, and assuming they were correct, the total is $2,900,000 that is going to be charged to cash over the next three months to the Debtor's assumption of this agreement and to the operation of the 747.

Section 365 requires a prompt cure or reasonable assurance of prompt cure. The Debtor argues it does not intend to cure immediately the Half Million Dollar letter of credit because there isn't any provision, first of all, in the lease. It has to be replenished only under the technical services agreement. Under Section 1110, there is no requirement that the maintenance agreement be cured with the sixty

(60) day period following filing, only the lease of aircraft. But it must be cured over some period of time, even if debtor's argument is correct.

Assuming that the Debtor's figures are correct, and that the lease and service agreement have been modified, the three months of lease would be $555,000. The three months of the minimum maintenance would be $550,000.

There would still be a requirement to replenish the technical services letter of credit of Half Million Dollars. The insurance is $24,000. The Debtor confesses a default of $300,000. The total cash, in rough figures, is $1,900,000.

These figures are before any expenses of operation, such as fuel, crew, and does not include any contingencies that might arise out of operations at O'Hare, which all recognize can be tenuous at best in the wintertime, or contingencies arising out of any kinds of mechanical problems with the aircraft, or contingencies arising out of the fact the charterer is not obligated to pay in full if it does not deliver all the passengers.

The Court also notes, under the charter agreement, that the Debtor may substitute aircraft. In that regard, the Court notes that, while this has not been definitively resolved, the Debtor does have now available to it additional aircraft that have been sold to it by Pan Am which are the subject of settlement negotiations, and those aircraft would be available.

There is no showing by the Debtor that it could not service this agreement, although with many more expenses, by providing 707's instead of 747's.

The Court notes that in the projections for December, January and February, the 747 contributes to the gross cash flow of the Debtor, but its profit margin runs in the neighborhood of $70,000 to $100,000 on a monthly basis.

In trying to determine whether, in fact, the Debtor is exercising appropriate business judgment in seeking to assume this lease, as amended, and according to the

testimony of the Debtor, the lease is for a year, there is no evidence that there was any provision in the oral amendments which allowed cancellation on a ninety (90) day notice. The Court will assume first, in making this analysis it is an annual lease, which would obligate the Debtor to make all of the payments without regard as to whether it needed the aircraft over the entire year.

Under those circumstances and in view of the fact that the charter expires in April and there is no showing as to the necessity of having the aircraft after April, the Court concludes that if there is an annual lease, there is insufficient evidence to demonstrate to the Court that there is sound business judgment for assuming the lease for a year.

Looking at it on the other analysis as with the ninety (90) day cancellation, the cancellation power runs to both parties. So even if Air Canada chose to obey an Order of the Court authorizing the debtor to assume, it could then give notice of cancellation upon ninety (90) days. And while this Court might be able, under its equity powers, to compel Air Canada to extend that lease, the Court is dubious about such power.

Nonetheless, looking at the lease on a ninety (90) day basis, what the Debtor proposes is to spend either $2.9 Million according to Air Canada's figures, or $1.9 Million according to its own figures, to make about $300,000. There are obviously other considerations. One of those, of course, is that the Debtor must perform or must make its best efforts to perform under these charters because that is the bulk of its business. But the evidence suggests that Debtor can perform without the 747.

On the state of the evidence that has been presented to the Court, the Court finds that the Debtor has not borne its burden of proving that in the exercise of reasonable business judgment, it would be of benefit to the Debtor to assume this agreement.

The Court at this time DENIES the Motion to Assume without prejudice to subsequent proceedings.