# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

02-6077/02-6078EM

_____

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Crystalin, L.L.C., | * | |
| | * | |
| Debtor. | * | |
| | * | |
| Crystalin, L.L.C. and | * | |
| Citizens National Bank of Greater | * | Appeal from the United States |
| St. Louis, | * | Bankruptcy Court for the |
| | * | Eastern District of Missouri |
| Appellants, | * | |
| | * | |
| v. | * | |
| | * | |
| Selma Properties, Inc., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: April 23, 2003
Filed: May 27, 2003

_____

Before KRESSEL, Chief Judge, DREHER, and FEDERMAN, Bankruptcy Judges.

_____

DREHER, Bankruptcy Judge.

This is an appeal from an order of the bankruptcy court denying Debtor's motion to assume a real property lease, and from a subsequent order denying the

motions of Debtor and Citizens National Bank of Greater St. Louis to alter or amend the judgment. For the reasons stated below we reverse and remand.

FACTS

Debtor, Crystalin, L.L.C ("Debtor") is a limited liability company formed for the purpose of purchasing and operating Crystal Highlands Golf Course ("the golf course"). The golf course is located in Jefferson County, Missouri.

The golf course was built on land originally owned by the Union Pacific Railway ("Union Pacific"). In the early 1980s, Union Pacific formed Appellee, Selma Properties Inc. ("Selma"), which took title to the land and built an exclusive resort and meeting facility on part of the land. The facility was to be used for Union Pacific business activities. In the late 1980s, Union Pacific decided the facility needed an adjacent golf course which could be used by guests who visited the facility. Because Selma could not fully utilize the course, the development of the golf course was structured through a long-term lease of the real property to a golf course developer who would be responsible for building and maintaining a public course which Selma could also use.

On June 1, 1987, Selma entered into a Lease Agreement ("the Lease") with Crystal Highlands Golf Club, Inc ("CHGCI"). Pursuant to the Lease, CHGCI was required to build, operate and maintain an 18-hole public golf course on the leased property. The term of the Lease expires on May 31, 2027.

Section 1 of the Lease ("the quality standards") provides, in part, that:

> [The] golf course shall be suitable for Championship play and shall be maintained on a level equivalent to other first rate courses in the St. Louis, Missouri area.
>
> * * *

The Facilities shall be constructed, maintained, operated and renewed in strict conformity with and in accordance with current guidelines of the USGA and PGA or successor organizations.[1]

Section 2(a) of the Lease granted Selma free access and use of the golf course for 20 persons per day, subject to certain exceptions for tournament and league play. There was no monthly rental payment; instead the lessee was obliged to pay Selma 10% of lessee's "net income" as that term was defined in the Lease. The parties agree that the golf course has never had any "net income" that would have triggered an obligation to pay monetary rent. However, the Lease contained a number of other covenants, including the lessee's obligation to insure the property, pay real estate taxes, and comply with the quality standards. The Lease provided that failure to comply with any of these obligations would constitute an event of default, provided such default was not cured within the time period set forth in the Lease.

In Section 14 of the Lease, Selma also granted an option to purchase the leased property at any time during the term of the Lease at a price established by an appraisal process set forth in the Lease. The process involved the parties agreeing to an appraiser, or by each party selecting its own appraiser, with a third to be selected by the first two, and required that "[the]. . . appraisers . . . be instructed to appraise the Premises as if vacant and to base the appraisal upon the value of comparable unimproved property . . .". The Lease further provided that if the lessee purchased the property at the appraised price, Selma must transfer title to the lessee by quitclaim deed; provided, however, that the lessee's covenants, including the covenant of continuing operation in accordance with the quality standards and the grant of Selma's use rights under Section 2(a), would run with the land until May 31, 2027. This section further stated that the breach of any of these covenants would entitle Selma to repurchase the property.

_____

[1]The testimony at trial indicated there are not and never have been USGA or PGA guidelines for course construction, maintenance or operation.

CHGCI designed and constructed the golf course. The course opened for play in the fall of 1988. In February 1996, Selma consented to the assignment by CHGCI of its rights and interest in the Lease to Healthquarters of Crystal Highlands, LLC ("Healthquarters"). Debtor is an affiliate of Healthquarters. Healthquarters borrowed the funds to acquire CHGCI's interest in the Lease from a local bank. Three years later, on February 26, 1999, Debtor obtained a $4.5 million loan from Citizens National Bank of Greater St. Louis ("CNB"). The Lease was assigned to Debtor with Selma's consent. Debtor then granted CNB a security interest in Debtor's leasehold interest in the golf course, as well as a deed of trust on Incline Village, a second golf course owned by Healthquarters. The loan proceeds were used to pay off the existing indebtedness on the golf course and to finance certain improvements to both golf courses. In addition to a Leasehold Deed of Trust from Debtor to CNB, Debtor, Selma, and CNB also signed a Landlord's Waiver and Consent Agreement which provides, in relevant part, as follows:

> 2. Mortgage. . . . Borrower [Debtor] and Lender [CNB] upon the occurrence of an event of default under the Financing Agreements shall be able to sell, assign, transfer or otherwise convey Borrower's interest in the Lease to any third party, with the prior written consent of Landlord [Selma], which such consent shall not be unreasonably withheld or delayed, provided that all monetary defaults under the Lease are either cured or provided for by an approved third party and that the transferee, purchaser, or assignee assumes the obligations of the Borrower under the Lease, effective as of the date of the transfer and attorns to Landlord.
>
> * * *
>
> 6. Lender's Right to Cure and Notice. Landlord hereby covenants and agrees that it will give written notice to Lender of the occurrence of any default or event of default by Borrower under the Lease at the same time Landlord gives such notice to Borrower and Lender shall have the right, but not the obligation, to cure any such default within thirty (30) days after Lender's receipt of notice from the Landlord; . . . .

The golf course has never done well. Between 1988 and 2001 revenue declined steadily, the result of increasing competition in public courses in the area and a highway improvement project that has hindered access to the course. While the course was under professional management during the 2002 golf season, revenue showed some improvement, but the course continued to experience consistent net losses. In 2001, for example, it lost over $600,000; and by 2001, the course was burdened with approximately $4.5 million in debt, approximately $4 million owed to CNB and about $500,000 owed to a second commercial lender. Although Debtor sporadically paid down long term debt, finances were so poor that CNB had to reimburse Selma for its payment of real estate taxes in 2001 and 2002 in the sum of $40,000, and to also pay $20,000 to the professional manager hired to operate the course in 2002. While the experts for each side differed as to the amount of deferred maintenance on the course, they both agreed that the golf course needed some attention. The estimates of costs to improve the course ranged from $350,000 to $900,000.

In spite of this poor economic picture, at least two offers to purchase Debtor's leasehold interest in the golf course had been made. One group of investors approached Selma in the fall of 2001 and offered to purchase the course for $1.8 million. In the Spring of 2002, the company hired to manage the golf course expressed interest in purchasing the golf course for $2.1 million. Neither expression of interest was pursued because, at least in part, the potential purchasers needed assurances that the Lease was not in default and Selma would not provide that assurance.

The relationship between Debtor and Selma was somewhat acrimonious from the start. On numerous occasions, Selma expressed dissatisfaction with the conditions on the course and called attention to the quality standards. From time to time, Debtor did not timely pay insurance premiums or real estate taxes as they came due. These defaults, however, were always cured and Debtor attempted to

satisfy Selma's complaints by improving operations and making improvements to the course. Nonetheless, the matter came to a head when, by letter dated January 17, 2002, Selma gave written notice that events of default had occurred under the Lease. The specific alleged defaults were: 1) nonpayment of the 2000 and 2001 real estate taxes; 2) unauthorized assignment of the Lease; 3) nonpayment of rent; 4) failure to provide a certificate of insurance; and 5) inadequate maintenance and operation of the golf course in violation of the quality standards.

On February 22, 2002, Debtor notified Selma that Debtor was exercising its option to purchase the property. On the same day, CNB also purported to do so. Debtor and CNB subsequently hired an appraiser and notified Selma of the selection. Selma, however, refused to appoint an appraiser. It took the position that Debtor was in default under the Lease, as a consequence of which a purchase was futile because of Selma's right under the Lease to repurchase the property if Debtor was in default.

On February 22, 2002, Debtor also filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code. Debtor continued in possession of the course throughout the 2002 golf season and hired a professional manager to improve conditions and performance at the course. The manager oversaw operations, improved the condition of the golf course, and attempted to raise revenues and operate at a profit. Throughout the reorganization process Debtor contended that its reorganization plan consisted of selling the course, either to CNB or to a third party, and not continuing operations.

On May 3, 2002, Debtor filed a motion to assume the Lease ("the motion to assume") pursuant to Section 365 of the Bankruptcy Code. Debtor argued that it was not in default under the Lease and that, in its business judgment, assumption was beneficial to the estate. It made this judgment based, in part, on the fact that the Lease contained a favorable monetary rent provision and an extremely

favorable purchase option which Debtor had exercised. Selma opposed that motion. It argued that there were defaults under the Lease which were not capable of being cured and that Debtor could not provide adequate assurance of cure and assurance of future performance under the Lease. Before the commencement of a lengthy evidentiary hearing, Selma acknowledged that there were no defaults under the Lease other than the alleged failure of the Debtor to meet the quality standards. The remaining defaults either never existed or were cured within the allowed time period.

The bankruptcy court announced its decision from the bench on October 8, 2002, and issued its order on October 30, 2002. It held that Debtor was not in default under the Lease. The bankruptcy court assumed that there were maintenance and operational lapses at the golf course, but further held that the condition of the course was no worse than other high quality, championship type courses in the St. Louis area. The course was "suitable for championship play and . . . maintained on a level equivalent to other first rate courses in the St. Louis, Missouri area." This finding has not been challenged on appeal.

The bankruptcy court went on, however, to deny Debtor's motion to assume because, in the court's view, assumption was not in Debtor's best interest. The bankruptcy court based its rejection of Debtor's business judgment decision on essentially three findings: 1) there were not then any pending offers to purchase or assign the Lease; 2) Debtor did not have sufficient assets to fund needed repairs, capital improvements and maintenance requirements at the golf course, and 3) the Lease was not a favorable asset in the bankruptcy sense, nor an attractive asset to third parties.

Debtor timely moved under Federal Rule of Bankruptcy Procedure 9023, incorporating Federal Rule of Civil Procedure 59(e), to alter or amend the judgment, arguing that circumstances had changed. In addition to arguing that the

bankruptcy court had improperly applied the business judgment test, Debtor urged that, in the absence of a finding that Debtor was in default under the Lease, Selma no longer had a right to refuse to move forward with the appraisal process. Debtor further argued that, at the suggestion of Selma's counsel, this very issue had been deferred subject to a further look once the default issue was resolved. Debtor pointed out that during trial Debtor had urged the court to require Selma to appoint its appraiser. To this, Selma's counsel said:

> That we ought to find out if this lease is going to be assumed or rejected. That's what the debtor asked for in its motion . . . We don't think it's appropriate at this time that we'd ask that this request for interim relief, at this time at least, be denied until the parties could brief it or do whatever the debtor wants to do in a subsequent motion, to have it then properly before the court and give us a chance to respond . . .

Debtor further pointed out that at trial CNB had made clear its willingness to fund the cure of any defaults the court found and to purchase or finance the purchase of the golf course in order to protect the value of its collateral. To make clear CNB's affirmance of that position, the Debtor appended to its motion a written offer dated October 11, 2002, from CNB to finance Debtor's purchase of the golf course from Selma at the value determined by the appraisers. This financing commitment was contingent only on Debtor's agreement to sell the golf course and Incline Village to CNB for $4,288,465.43, the amount of CNB's secured claim in the case plus $100,000.

On November 22, 2002, the bankruptcy court denied the motion. Both CNB and Debtor ("Appellants") appeal the October 30 order and the November 22 order.

DECISION

I.    STANDARD OF REVIEW

We review the bankruptcy court's conclusions of law de novo and its findings of fact for clear error. Tax 58 v. Froehle (In re Froehle), 286 B.R. 94, 96 (B.A.P. 8th Cir. 2002). "A finding [of fact] is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Waterman v. Ditto (In re Waterman), 248 B.R. 567, 570 (B.A.P. 8th Cir. 2000) (citing Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985)).

In this appeal, the determination of the proper legal standard to be applied to Debtor's motion to assume the Lease is a legal conclusion, which we review de novo. Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.), 756 F.2d 1043, 1047 (4th Cir. 1985). The bankruptcy court's determination that assumption of the lease was not in the best interest of the estate is a finding of fact reviewed under the clearly erroneous standard. *See* Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 562 (8th Cir. 1997). The bankruptcy court's denial of a motion pursuant to Rule 59(e) is reviewed for abuse of discretion. Concordia College Corp. v. W.R. Grace & Co., 999 F.2d 326, 330 (8th Cir. 1993).

II.   THE BUSINESS JUDGMENT TEST

The first issue raised by Appellants is whether the bankruptcy court applied the proper test in denying Debtor's motion to assume. We conclude that the bankruptcy court applied the proper test. Section 365(a) provides that, with exceptions not applicable here, "the trustee [or debtor-in-possession], subject to the court's approval, may assume or reject any executory contract or unexpired

lease of the debtor." 11 U.S.C. § 365(a). In deciding whether to approve a debtor-in-possession's motion to assume, reject, or assign an unexpired lease or executory contract, the bankruptcy court used a business judgment test. *See* <u>Food Barn</u>, 107 F.3d at 566 n.16. This test is not an onerous one and does not require the bankruptcy court to place "itself in the position of the trustee or debtor-in-possession and determining whether assuming the [lease] would be a good business decision or a bad one." <u>Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)</u>, 4 F.3d 1095, 1099 (2d Cir. 1993), *cert. dism.*, 511 U.S. 1026 (1994). In the Eighth Circuit, the business judgment test consists of two parts. Initially, the assumption of a lease must be in the "exercise of a sound business judgment" showing benefit to the estate. <u>In re Global Int'l Airways</u>, 35 B.R. 881, 886 (Bankr. W.D. Mo. 1983). It is Debtor's burden to prove that lease assumption benefits the estate. *Id.* at 888.

> As stated in <u>Orion Pictures</u>, in reviewing a trustee's or debtor-in-possession's decision to assume an executory contract, then, a bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession, and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate. Although the court uses a business judgment test in deciding whether to approve a trustee's motion to assume, reject, or assign an unexpired lease or executory contract, this entails a determination that the transaction is in the best interest of the estate.

<u>In re Tama Beef Packing, Inc.</u>, 277 B.R. 407 (Bankr. N.D. Iowa 2002)(*citing* <u>Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)</u>, 78 F.3d 18, 25 (2d Cir.1996)("Th[e] decision [to allow a debtor to assume an unexpired lease] required a judicial finding--up-front--that it was in the best interests of the estate (and the unsecured creditors) for the debtor to assume the lease . . . ."). "Where the trustee's request is not manifestly unreasonable or made in bad faith, the court should normally grant approval 'as long as [the proposed action] *appears* to

enhance [the] debtor's estate." Food Barn, 107 F.3d at 566 n.16, (*quoting* Richmond Leasing Co. v. Capital Bank, N.A., 762 F. Supp. 1303, 1309 (5th Cir. 1985), (emphasis added)).

If the initial test is met, the bankruptcy court should not interfere with the trustee or debtor-in-possession's business judgment "except upon a finding of bad faith or gross abuse of their 'business discretion.'" Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d at 1047. If Debtor cannot show a benefit to the estate, the bankruptcy court does not need to make a finding of bad faith or gross abuse of discretion. Food Barn, 107 F.3d at 558 n.16. Although the bankruptcy court found no material default in the Lease, it is within the discretion of the bankruptcy court to approve or disapprove assumption of an unexpired lease and the bankruptcy court may deny a motion to assume an unexpired lease where Debtor fails to demonstrate a benefit to the estate even if the Lease is not in default. *See, e.g.*, In re Gateway Apparel, Inc., 210 B.R. 567, 571 (Bank. E.D. Mo. 1997) ("Gateway Apparel I") (denying motion to assume unexpired real property leases which were not in default).

In this case, Selma never alleged that Debtor's decision to assume was made in bad faith or constituted a gross abuse of discretion. The only issue before the bankruptcy court was whether assumption was likely to benefit the estate. Debtor argued that assumption would lead to sale and a quick end to Debtor's chapter 11. At the time of the evidentiary hearing, however, no sale was pending and all offers to purchase were withdrawn. Nevertheless, the evidence was also clear that Selma's insistence as to the existence of a default was preventing CNB, and possibly others, from making an offer prior to the hearing.

As a result of the bankruptcy court's finding that no default existed, we need not reach the issue of whether the bankruptcy court, while applying the proper test, erred in initially denying Debtor's motion and ordering the Lease

-11-

rejected. Once the bankruptcy court determined that no default existed under the Lease that a prospective purchaser need immediately cure, CNB, in the period between the bankruptcy court announcing its finding and the actual entry of the order, made an offer to Debtor to purchase the property. In light of this offer, it became apparent that the proposed assumption would enhance the estate, and the bankruptcy court abused its discretion in not granting Debtor and CNB's motion to alter or amend the judgment. CNB's counsel reiterated and confirmed, during oral argument on appeal, that the offer is still outstanding.

## III.    DEBTOR AND CNB'S MOTIONS TO ALTER OR AMEND JUDGMENT

Appellants timely filed a motion to alter or amend the judgment under Federal Rule of Bankruptcy Procedure 9023 that made Federal Rules of Civil Procedure 59(e) applicable to this proceeding. Rule 59(e) states that "[a]ny motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment." FED. R. CIV. P. 59(e).

> Although the rule identifies the time within which such a motion must be filed,   it does not otherwise establish the criteria by which the court is to assess the merits of the motion.   However, the Eighth Circuit Court of Appeals quoted with approval the Seventh Circuit Court of Appeals' statement that the 'limited function' of a motion for reconsideration is 'to correct manifest errors of law or fact or to present newly discovered evidence.'

DeWit v. Firstar Corp., 904 F. Supp. 1476, 1495 (N.D. Iowa 1995)(*citing* Hagerman v. Yukon Energy Corp., 839 F.2d 407, 414 (8th Cir. 1988) (*quoting* Rothwell Cotton Co. v. Rosenthal & Co., 827 F.2d 246, 251 (7th Cir. 1987), *as amended*, 835 F.2d 710 (7th Cir. 1987)). Rule 59(e) is not intended to allow parties to introduce new evidence that was subject to discovery prior to trial, tender new theories, or raise arguments which could have been offered or raised

prior to judgment. *See* Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills, 141 F. 3d 1284, 1286 (8th Cir. 1998).

In addition, the bankruptcy court has broad discretion in determining whether to grant a motion to alter or amend judgment, and we will not reverse absent a clear abuse of discretion. *See* Hagerman, 839 F.2d at 414. A motion made pursuant to Rule 59 affords relief only in extraordinary circumstances. Dale & Selby Superette & Deli v. United States Dep't of Agric., 838 F. Supp. 1346, 1348 (D. Minn. 1993). But the rule allows the bankruptcy court "to correct its own errors, sparing the parties and appellate courts the burden of unnecessary appellate proceedings." Charles v. Daley, 799 F.2d 343, 348 (7th Cir. 1986). And under the unique facts of this case we find that extraordinary circumstances did exist and that denial of Debtor and CNB's motions to alter or amend the judgment constitutes an abuse of discretion.

The bankruptcy court should have recognized that new circumstances existed once it determined that the Lease was not in default. Those circumstances were manifested by CNB's offer to finance and purchase made after the bankruptcy court's announcement of its decision on the record, but prior to the bankruptcy court's October 30, 2002 order. Although this offer cannot be considered "newly discovered evidence" since it did not exist at the time of trial, *see* Strobl v. New York Mercantile Exch., 590 F. Supp. 875, 878 (S.D.N.Y. 1984), *aff'd*, 768 F.2d 22 (2d Cir.), *cert. denied*, 474 U.S. 1006 (1985)(*quoting* Campbell v. American Foreign S.S. Corp., 116 F.2d 926 (2d Cir. 1941)); *see also* United States v. Hall, 324 F.3d 720, 723 n.5 (D.C. Cir. 2003) and the cases cited therein, CNB's offer was a foreseeable result of the bankruptcy court's finding that the Lease was not in default and it must be considered in light of the evidence presented at trial, including CNB's stated intent during trial that it was willing to make such an offer and Selma's statements during trial that a later motion was to be expected.

When the bankruptcy court found the Lease not in default, it allowed CNB the ability to purchase the property without fear of curing, or Debtor being unable to cure.  The bankruptcy court's hesitance to allow assumption should have substantially dissipated with CNB's offer.  This offer could not have been made prior to the bankruptcy court's decision.  With CNB's offer that included an offer to provide $100,000.00 for the benefit of the estate,[2] assumption of the Lease easily meets the business judgment test and the bankruptcy court abused its discretion by failing to amend the judgment to allow for assumption of the Lease.

Furthermore, although delineated as a motion under Rule 59(e) the bankruptcy court could also have granted the motion under  Federal Rule of Civil Procedure 60(b)(6).

> [T]he standards for relief from judgment under  Rules 59(e) and 60(b) . . . require the court ultimately to consider how justice can best be served, not whether or not the attorneys for the losing side have done their job in identifying the basis for the relief the *party* may wish to obtain.

DeWit,  904 F. Supp. at 1506 (emphasis in original).

Rule 60(b)(6) states that "[o]n motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:  . . . (6) any other reason justifying relief

---

[2]Even if these funds did nothing more than pay the administrative expenses of the estate or allow Debtor a chance at reorganization, the funds provide a benefit to the estate sufficient to meet the requirement of the business judgment test. *See, e.g.* Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800 (9th Cir. 1994)(broadly interpreting "benefit to the estate" under 11 U.S.C. § 550(a)); In re GP Express Airlines, Inc., 200 B.R. 222, 230 (Bankr. D. Neb. 1996)(finding Debtor unable to reorganize without assumption).

-14-

from the operation of the judgment." Rule 60(b)(6), like Rule 59(e), was intended to provide relief only where "exceptional circumstances prevented the moving party from seeking redress through the usual channels." Atkinson v. Prudential Property Co., Inc., 43 F.3d 367, 373 (8th Cir. 1994)(citations omitted). The court in Atkinson went on to observe that "[e]xceptional circumstances" are not present every time a party is subjected to potentially unfavorable consequences as a result of an adverse judgment properly arrived at. Rather, exceptional circumstances are relevant only where they bar adequate redress." Atkinson, 43 F.3d at 373-74. Just as we determine exceptional circumstances warranting relief under Rule 59(e), we conclude that those circumstances would also warrant relief from the judgment under Rule 60(b)(6), although not specifically plead by CNB and Debtor.

CNB's offer, coming on the heels of the bankruptcy court's finding that the Lease was not in default, immediately contradicted the bankruptcy court's assumption that the Lease was not a favorable asset of the estate or an attractive asset to third parties. It also mitigated the bankruptcy court's concern that there were no pending offers to purchase or assign the Lease and that Debtor did not have sufficient assets to fund needed repairs, capital improvements and maintenance requirements. Considering CNB's offer, a direct result of the bankruptcy court's decision, the bankruptcy court abused its discretion in not amending its factual finding to reflect that assumption of the Lease would be in the best interests of the estate.

Accordingly, the decision of the bankruptcy court to deny Debtor and CNB's motions to alter or amend the judgment is reversed. We remand for entry of an order vacating the October 30, 2002 order and entering an order approving the Debtor's assumption of the Lease.

A true copy.

Attest:

        CLERK, U.S. BANKRUPTCY APPELLATE PANEL,
        EIGHTH CIRCUIT