**IN RE: NORANDA ALUMINUM, INC., et al., Debtors.**

**Case No. 16–10083–399 (Jointly Administered)**

United States Bankruptcy Court, E.D. Missouri, Southeastern Division.

Signed April 0, 2016

Angela L. Drumm, Carmody MacDonald PC, Saint Louis, MO, for Debtors.

## MEMORANDUM OPINION

Barry S. Schermer, United States Bankruptcy Judge

This matter comes before me on the on the *Debtors' Motion for an Order Pursuant to Sections 105(a) and 365 of the Bankruptcy Code and Bankruptcy Rule 6004 and Authorizing the Rejection of Certain Executory Contracts Nunc Pro Tunc to the Petition Date* (Rejection Motion) regarding a long term bauxite sales agreement (Sherwin Contract) between Debtor Noranda Bauxite Ltd. (NBL) and Sherwin Alumina Co., LLC (Sherwin).

What makes this otherwise ordinary § 365 Rejection Motion extraordinary are the parties, timing and stakes involved. The parties to the Sherwin Contract are each Chapter 11 debtors in possession. NBL, which mines and sells bauxite, filed its petition in the Eastern District of Missouri. Sherwin, which buys the majority of its bauxite from NBL, filed its petition in the Southern District of Texas. As one of its first day motions, Sherwin moved to assume the Sherwin Contract; NBL moved to reject the Sherwin Contract the first day of its Chapter 11. NBL asserts that it will lose approximately $16.5 million under the contract in 2016 alone. Sherwin disputes that NBL loses money on the contract and argues that if rejection is granted, it may be forced out of business, causing 575 workers to be unemployed.

For the reasons that follow, I grant the Rejection Motion. The Sherwin Contract is rejected as of February 8, 2016.

## BACKGROUND

NBL is responsible for mining from Jamaica all the bauxite that Noranda Aluminum, Inc. and its affiliated entities (Debtors) use in a vertically integrated portion of their business (Upstream Business). NBL's bauxite is refined into alumina (the main component in aluminum) at an affiliate's refinery in Gramercy, Louisiana (Gramercy). NBL also mines bauxite for sale to third-parties. In 2012, NBL and Sherwin entered into the Sherwin Contract. The Sherwin Contract (as amended) represents practically all of NBL's third-party sales of bauxite and is scheduled to expire at the end of 2018.

Like the Gramercy affiliate, Sherwin refines its bauxite at a Texas refinery located near the Gulf of Mexico. The location provides easy shipping access for Jamaican bauxite. Neither party contests that the Sherwin Contract is executory.

## DISCUSSION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b), 157(b)(2)(A) and (O) and Local Rule 9.01(B) of the United States District Court for the Eastern District of Missouri. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

### A. *Legal Standard for Rejection*

The ability of a debtor to reject a burdensome executory contract is a fundamentally important component of bankruptcy law. "[T]he authority to reject an executory contract is vital to the basic purpose to a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *In re Old Carco LLC (f/k/a Chrysler LLC)*, 406 B.R. 180, 187 (Bankr.S.D.N.Y.2009) (quoting *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)) (internal quotation marks omitted).

In the Eighth Circuit, the business judgment test is used "in deciding whether to approve a trustee's motion to assume, reject, or assign an unexpired

lease or executory contract, [which] entails a determination that the transaction is in the best interest of the estate." *Four B. Corp. v. Food Barn Stores, Inc., (In re Food Barn Stores, Inc.),* 107 F.3d 558, 567 n. 16 (8th Cir.1997); *Crystalin, L.L.C. v. Selma Props., Inc. (In re Crystalin, L.L.C.),* 293 B.R. 455, 463–64 (8th Cir. BAP 2003). The business judgment test "is not an onerous one and does not require the bankruptcy court to place 'itself in the position of the trustee or debtor-in-possession and determining whether assuming the [lease] would be a good business decision or a bad one.'" *Crystalin,* 293 B.R. at 464 (quoting *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1099 (2d Cir.1993), *cert. dism.,* 511 U.S. 1026, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994)).

■ There are two parts to the business judgment test in the Eighth Circuit. *See Crystalin,* 293 B.R. at 464 ("In the Eighth Circuit, the business judgment test consists of two parts."). First, "the assumption of a lease must be in the 'exercise of sound business judgment' showing benefit to the estate." *Id.* (quoting *In re Global Int'l Airways,* 35 B.R. 881, 886 (Bankr.W.D.Mo.1983)). The bankruptcy court acts as "an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession, and not, as it does in other circumstances, as the arbiter of disputes." *Id.* (quoting *In re Tama Beef Packing, Inc.,* 277 B.R. 407 (Bankr. N.D.Iowa 2002) (citation omitted)).

Second, "the bankruptcy court should not interfere with the trustee or debtor-in-possession's business judgment 'except on a finding of bad faith or gross abuse of their 'business discretion.'" *Crystalin,* 293 B.R. at 464; *Food Barn,* 107 F.3d at 567 n. 16 ("Where the trustee's request is not manifestly unreasonable or made in

bad faith, the court should normally grant approval '[a]s long as [the proposed action] appears to enhance [the] debtor's estate.'") (quoting *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1309 (5th Cir.1985)).

■ Sherwin argues that, rather than using a business judgment test, I should apply a "balancing of the equities test" because both parties to the Sherwin Contract are debtors in bankruptcy. I disagree. The main case cited by Sherwin as support for its position, *In re Midwest Polychem, Ltd.,* 61 B.R. 559 (Bankr. N.D.Ill.1986), is thirty years old and is not binding authority. *Midwest Polychem* involved a debtor seeking to reject a contract containing a restrictive covenant so that it could expand its business and compete with the contract counterparty (who was also a debtor in bankruptcy). *Id.* at 561. The *Midwest Polychem* court stated that "[t]he balancing of the equities is especially necessary where, in a case like the instant one, one Chapter 11 debtor formally requests rejection of an executory contract and another Chapter 11 debtor effectively seeks assumption." *Id.* at 562. The *Midwest Polychem* court determined that it did not need to choose between the business judgment test or the balancing of the equities test because the result was the same under both tests after considering the equities. *Id.* Ultimately, it denied the debtor's motion to reject, stating that allowing the debtor to reject the contract "makes no business or equitable sense." To the extent that *Midwest Polychem* dictates a balancing of the equities test, I respectfully disagree.

Two other cases cited by Sherwin as support for the balancing of equities test in a two debtor situation are each twenty-eight years old and are decisions by the same judge in a jurisdiction that does not provide binding authority. *See In re H.M.*

*Bowness, Inc.*, 89 B.R. 238, 242 (Bankr. M.D.Fla.1988); *In re Sun City Investments, Inc.*, 89 B.R. 245, 249 (Bankr. M.D.Fla.1988). Upon careful review, both cases were decided using a business judgment test.

■ Sherwin also argues that, even under the business judgment test, I must consider the damages to the counterparty relative to the benefit to the debtor's estate. Again, the cases cited by Sherwin are not binding authority and are not current. In addition, it would contradict binding authority to read into the business judgment test a consideration of the interest of counter parties before allowing rejection of contracts. *See Food Barn*, 107 F.3d at 566 n. 16; *Crystalin*, 293 B.R. at 463–64. Moreover, case law cited by Sherwin has been repudiated by other courts. *See, e.g., Old Carco*, 406 B.R. at 191–92 (rejecting the argument that *The Monarch Tool & Mfg. Co. v. Monarch Prod. Sales Corp.) (In re Monarch Tool & Mfg. Co.)*, 114 B.R. 134, 137 (Bankr.S.D.Ohio 1990) and *Robertson v. Pierce (In re Chi–Feng Huang)*, 23 B.R. 798, 801 (9th Cir. BAP 1982), require a consideration of the counterparty's interests, stating that those cases "involve circumstances under which the business judgment standard either failed to be met or failed to be properly applied by the bankruptcy court."). To the extent that any of the cases cited by Sherwin require a consideration of the interests of counterparties in the application of the business judgment rule, I disagree with them. *See In re Sabine Oil & Gas Corp.*, 547 B.R. 66, 71 (Bankr.S.D.N.Y. 2016) ("Unless a separate provision of the Bankruptcy Code provides a non-debtor party with specific protection, the interests of the debtor and its estate are paramount; adverse effects on the non-debtor contract party arising from the decision to assume or reject are irrelevant.").

■ Sherwin argues that this is an extraordinary case meriting application of a heightened standard to the business judgment rule for rejection because one debtor sought to assume the agreement on the first day of its case and the other debtor sought to reject the agreement the first day of its case. *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)· and *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 378 F.3d 511 (5th Cir.2004), are cases demonstrating the narrow circumstances in which a higher standard applied to the rejection decision. *See Old Carco LLC*, 406 B.R. at 189–90 (higher standard for rejection of a contract applied in *Bildisco* and *Mirant* "because the authority to reject under § 365(a) conflicted with the policies designed to protect the national interest underlying other federal regulatory schemes."). No such regulatory schemes or federal statutes are called into play by NBL's Rejection Motion.

*Bildisco* and *Mirant* involved requests to reject contracts in which federal regulatory schemes other than § 365 were implicated and there was an overriding public interest, or for which rejection would pose a particular danger to public health or safety. Sherwin's interest in preserving the Sherwin Contract to enable its own survival in no way presents a public interest that would merit a heightened standard for rejection and I see no other federal regulatory scheme that has been implicated. *See In re Pilgrim's Pride Corp.*, 403 B.R. 413, 425 (Bankr.N.D.Tex. 2009) ("If the bankruptcy court must second-guess every choice by a trustee or debtor in possession that may economically harm any given locale, the business judgment rule applicable to contract rejection and many other decisions in the chapter 11 process will be swallowed by a public policy exception.").

In addition, in certain instances, the Bankruptcy Code provides special treatment to certain types of executory contracts or unexpired leases. *See e.g.,* 11 U.S.C. §§ 365(b)(3) (adequate assurance of future performance of leases of real property in a shopping center); 365(n) (intellectual property license contracts); 1113 (collective bargaining agreements); 1110 (aircraft leases); 1165 (rejection of railroad lines under Bankruptcy Code § 1169). There is no specific statutory provision providing special treatment for rejection of a contract simply because the counterparty seeks to assume the same contract in his own bankruptcy case and will suffer if it is not able to do so.

I am sympathetic to Sherwin's plight,[1] but I will not deviate from the well established business judgment rule. See *Old Carco LLC,* 408 B.R. at 191–92 (court declined invitation to apply a heightened standard, even where some counterparties to the contracts (car dealers) were debtors in bankruptcy, stating it was "sympathetic to the impact of the rejections on the dealers and their customers and communities, but such sympathy does not permit the Court to deviate from well-established law and 'balance the equities,' instead of applying the business judgment standard."). *Id.* at 192.

## B. *Application of the Business Judgment Test*

■ NBL has met its burden of proving that the rejection of the Sherwin Contract is an exercise of sound business judgment, showing that it is in the best interest of the estate. Overall, the evidence shows that rejection of the Sherwin Agreement is necessary if NBL is to effectuate a re-

structuring. There is no evidence of bad faith or abuse of business discretion.

NBL's position in favor of rejection is based on significant cash loss suffered under the Sherwin Contract. The evidence clearly reflected that NBL loses money on every ton of bauxite it ships under the Sherwin Contract, making the cost of performance substantially more than the benefits it confers. The Rejection Motion was filed in an effort to minimize the loss.

The demonstration of this loss is set forth in the Debtors' Exhibits, as described in the testimony of NBL's Vice President and General Manager, Antoine Liddell, and the Debtors' Chief Restructuring Officer, Robert Caruso. Exhibits 16 and 24 present the loss based on projected calculations for calendar year 2016 comparing: (1) the financial result if NBL keeps the Sherwin Contract; and (2) the financial result if NBL rejects the Sherwin Contract. The calculations compute the results for mining and shipment of the bauxite to both Sherwin and Gramercy in one instance, and mining and shipment to only Gramercy in the other instance. No assumption is made for an alternate third-party buyer in either scenario. These calculations were made on an EBITDA basis, on an EBITDA less Capex basis, and on a EBITDA and Capex Cost basis.

The Debtors present NBL's cost to mine and ship the bauxite to Sherwin, and compare that cost with the amount for which the bauxite is sold under the existing Sherwin Contract. Allowing for an adjustment to the numbers in Exhibits 16 and 24 of a $700,000 increase in the category of Salaries, Wages & Benefits if the Sherwin Contract is rejected (an adjustment that is not disputed and about which Mr. Liddell

---

**1.** Sherwin must either discontinue its business, renegotiate a different contract with NBL on terms less attractive to it or alter its refinery to accommodate bauxite from a different seller (which has a different chemical composition). NBL is sophisticated and understands the leverage derived by rejection of the Sherwin Contract.

testified), NBL's projections show that it is forecasted to lose a total of approximately $16.5 million in 2016 (on an EBITDA less Capex basis) if the Sherwin Contract is not rejected. If the Sherwin Contract is rejected, this loss to NBL would· be decreased by approximately $6.8 million.

The Debtors acknowledged that following rejection of the Sherwin Contract, NBL would continue to lose a significant amount of money supplying only for Gramercy.[2] However, the Debtors' witnesses credibly testified that, even if NBL was not able to secure new third-party customers and continued to supply only to Gramercy, NBL would be in a better position after having rejected the Sherwin Contract than it would be in if the agreement was not rejected. The evidence demonstrated that NBL's losses would be decreased significantly by rejection of the Sherwin Contract, the Sherwin Contract is not a necessary part of the business plan for the Debtors' Upstream Business and rejection of the Sherwin Contract will better position NBL to attract new customers.

Sherwin was not able to ·defeat the showing that rejection of the Sherwin Contract constitutes sound business judgment and would provide a benefit to NBL's estate. Sherwin attempted to attack NBL's projected 2016 business plans through its expert witness, Gabriel Henn. Mr. Henn used the same categories of calculations as used by NBL and made calculations on the same bases as NBL (indeed, the same NBL exhibit). Based on his adjustments to NBL's numbers, Mr. Henn came to the opposite conclusion of NBL; that NBL would be better off if it did not reject the Sherwin Contract.

For several reasons, Sherwin was not able to discredit NBL's calculations. In more than one instance, Mr. Henn's calculations were based on his own view, and he could not set forth a plausible basis to substantiate them. For example, Mr. Henn made a $515,000 addition to NBL's calculation in the category for Diesel Fuel if the Sherwin Contract was rejected. Notwithstanding the fact that he had no disagreement with proposed steps to reduce such fuel use if NBL operated without the Sherwin Contract (as described by Mr. Liddell in his testimony), Mr. Henn maintained (without satisfactory substantiation) that the $515,000 adjustment should be made. With respect to the category for Outside Services, Mr. Henn changed NBL's calculation of the savings from rejecting the Sherwin Contract by $516,000. When questioned about the basis for this change, Mr. Henn admitted that this was just a matter of opinion. He did not challenge the proposition that those with more information (*i.e.* NBL)· could have better opinions.

With respect to his proposed $127,000 change for PR & Communications costs under the scenario where the Sherwin Contract was retained, Mr. Henn imposed his own view on how NBL should run its business, admitting his belief that NBL should change its PR & Communication processes. And with respect to his proposed decrease of more than $2.5 million for the Contract Miner Costs if the Sherwin Contract was retained, Mr. Henn was not able to rebut the argument that NBL was in a better position to gain knowledge about impacts on mining costs.

As an additional example, under the category for Salaries, Wages and Benefits, when challenged, Mr. Henn admitted that he did not understand Mr. Liddell's testimony regarding the $700,000 adjustment made by NBL and whether it was the same as his proposed $712,000 adjustment.

**2.** NBL sales to third-parties (other than Sherwin) is negligible.

During the hearing, I made a finding that $712,000 is the same as $700,000. In addition, Mr. Henn proposed a $3.1 million addition for "redundancy" costs to the Salaries, Wages & Benefits category in the situation where the Sherwin Contract was rejected. Redundancy costs are imposed by the government of Jamaica based on the reduction in workforce. In addition, Mr. Henn failed to take into account the other alternatives to redundancy (as proposed by NBL in its business judgment as set forth by Mr. Liddell) such as reduction in work days and weeks rather than effectuating reductions in its workforce. Mr. Henn also admitted that he did not understand whether the redundancy claim would be a pre-petition or a post-petition claim and what the impact would be of which type of claim it was.

Mr. Henn was unable to properly substantiate the balance of his proposed adjustments to NBL's calculations. Overall, Mr. Henn seemed to base his calculations on his own experiences, without additional research or support, and often, without fully understanding the situation or considerations involved in each category of NBL's analysis.

In addition to the use of Mr. Henn's testimony, Sherwin attempted to discredit the calculations by NBL and testimony of its witnesses (Mr. Liddell and Mr. Caruso) on cross examination. It did not succeed. Sherwin offered other documents in an effort to show why the numbers in NBL's Exhibits (as modified by the testimony of Mr. Liddell) should not be used. For example, Sherwin introduced the 2014 Securities and Exchange Commission Form 10–K filed by Noranda Aluminum Holding Corporation and a December 2, 2015 SEC letter in relation thereto, to argue that the Sherwin Contract offsets the fixed bauxite costs for production to the Debtors' own facility in Gramercy. I do not find these documents to be persuasive. First, they are filings of Noranda Aluminum Holding Corporation, not NBL. These historical filings are not relevant to the current situation that led NBL to exercise its business judgment in seeking to reject the Sherwin Contract, as was explained by Mr. Caruso in his testimony. Last, the financial analysis set forth in the Debtors' Exhibits and the testimony of witnesses establishes otherwise. In addition, no other exhibit presented by Sherwin adequately discredits the substantial evidence presented by the Debtors proving that rejection is within sound business judgment and of benefit to the estate.

Sherwin attacks the process by which the decision was made to seek rejection of the Sherwin Contract. According to Sherwin, additional and more formal steps were required, such as forming an independent directors' committee to analyze the decision, taking a vote of the board of directors, performing an analysis of the rejection damages claim to be filed by Sherwin, considering creditor recoveries in light of Sherwin's rejection damages claim, considering projections for calendar years 2017 and 2018, and determining the feasibility of a plan of reorganization. I see no requirement for these steps to be taken. The evidence showed that the decision to reject the Sherwin Contract was a thoughtful and careful decision that was made collaboratively by supervisors or managers responsible for each line item made by NBL in its calculations.

More specifically, Sherwin complains that the analysis of NBL's finances was calculated for only the year 2016, even though the Sherwin contract would not expire by its terms until the end of 2018. I see no problem with this. Mr. Liddell testified that his conclusions for 2017 and 2018 assumed all expenses and revenues would be sustained.

Likewise, Sherwin complains about the Debtors' failure to consider the amount of

Sherwin's rejection damages claim. I do not see the potential size of Sherwin's rejection damages claim to be a relevant factor for consideration. Even if the size of debt due unsecured creditors is increased by Sherwin's rejection claim, I find it especially persuasive that the Committee of Unsecured Creditors supports the request for rejection.

A stated reason for rejecting the Sherwin Contract is so NBL may sell bauxite to a third-party or Sherwin at a higher price. However, the request to reject the Sherwin Contract, and the financial analysis presented as evidence, do not assume the existence of another third-party contract. Sherwin believes that NBL's failure to identify an alternate third-party customer at this point is fatal to the success of the Rejection Motion. I disagree. NBL has not abused its business judgment by deciding it is better off without the Sherwin Contract, even if that agreement is not replaced by another customer agreement.

Notwithstanding the evidence in favor of the argument that rejection of the Sherwin Contract is beneficial to the estate, Sherwin questions NBL's motives for seeking rejection. According to Sherwin, NBL is improperly using the Rejection Motion as a threat to renegotiate with Sherwin the prices under the parties' contract. I see no bad faith or gross abuse of business discretion by any effort that has been made to obtain a more favorable and sustainable price for supplying bauxite to Sherwin or any other party. Moreover, the request to reject the Sherwin Contract is based upon the fact that it is unprofitable and a burden on the estate, regardless of whether NBL is able to secure an alternate agreement. Sherwin has put forth no credible argument or evidence showing bad faith or abuse of business discretion.

Sherwin maintains that the contract cannot be rejected because it would mean the end for Sherwin and the loss of over 575 jobs (not including an additional 1,500 independent contractors). This result would indeed be unfortunate. However, the inquiry under the business judgment test concerns the benefit to the estate of rejecting the burdensome contract; it does not consider the interests of the counterparty to the contract being rejected.

Overall, the decision to reject the Sherwin Contract is one made in the sound exercise of business judgment and for the benefit of the estate. There is no evidence of bad faith or abuse of business discretion. I find to be affirmation of the proper exercise of business judgment the fact that the Committee of Unsecured Creditors (in light of the rejection damages claim to be filed by Sherwin) and the Debtors' lenders have joined in and supported the request to reject the Sherwin Contract.

## CONCLUSION

This is an exceptional case. Not only are both parties debtors in Chapter 11 cases, but both face the real prospect of liquidation (*i.e.* the Upstream Business for the Noranda Debtors). However, I decline the invitation to add a special provision to Bankruptcy Code § 365 when Congress has elected to do so for other types of contracts or leases or to impose a heightened standard for rejection where none is merited. Accordingly, the long term bauxite sales agreement between Debtor Noranda Bauxite Ltd. and Sherwin Alumina Co., LLC is rejected as of February 8, 2016. Any claim arising out of the rejection of that contract shall be filed in accordance with any order pursuant to Bankruptcy Rule 3003(c) establishing a deadline by which prepetition unsecured nonpriority claims must be filed.