In re Florence CHI–FENG HUANG,
Debtor.

In re Sheila HUANG, Debtor.

Jerome E. ROBERTSON, Trustee,
Appellant,

v.

Robert L. PIERCE, Appellee.

BAP No. NC–81–1169–EGV.

Bankruptcy Nos. 3–80–2323, 3–81–00255.

United States Bankruptcy Appellate Panels
of the Ninth Circuit.

Argued Feb. 19, 1982.

Decided Sept. 9, 1982.

John Walshe Murray, Palo Alto, Cal., for appellant.

Robert R. Barton, Oakland, Cal., for appellee.

Before ELLIOTT, GEORGE and VOLINN, Bankruptcy Judges.

## OPINION

ELLIOTT, Bankruptcy Judge:

The Chapter 11 trustee in these cases has appealed the trial court's refusal to authorize the rejection of an executory contract to sell to the appellee, Robert L. Pierce, an apartment building owned jointly by the debtors. We reverse and remand the case for further consideration.

## FACTS

Florence Chi-Feng Huang ("Florence") filed her Chapter 11 petition in November of 1980; Florence's mother, Sheila Chen Huang ("Sheila"), filed her Chapter 11 petition in February 1981. Jerome E. Robertson was appointed trustee of each estate shortly after the respective filings. The debtors manage and operate a business known as The Kaleidescope, a California Corporation. The Kaleidescope is also before the same court, having filed a Chapter 11 case February 3, 1981.

The most significant asset in the estates is an apartment complex located in Menlo Park, California commonly known as the "Caroline Apartments." At the date of the first petition the Huangs owned the complex as joint tenants. For the purposes of this appeal, the parties stipulated the value of the complex is $2,400,000. The debtors' equity, deducting several deeds of trust is approximately $320,000.

On June 13, 1979 the Huangs entered into a written contract to sell the complex to Robert L. Pierce, the Appellee in this proceeding, for $1,900,000. Pierce has not taken possession of the complex and no part of the purchase price has been paid. We assume for the purposes of this appeal that Pierce has a valid, specifically enforceable contract. Pierce sought relief from the automatic stay in order to prosecute a pending state court performance action. The trustee responded by seeking to reject the contract as to both estates.

The trial court considered the relief from stay issue and the rejection issue simultaneously. It refused to permit rejection of the contract and granted relief from stay. The court denied permission to reject the contract on the grounds that to do so would violate fundamental principles of fair dealing and that "the primary beneficiaries of rejection would be the debtors, not creditors, and that is not a proper use of the rejection device." At the heart of this conclusion is the trial court's apparent conviction that each estate is solvent and that most of the unsecured claims scheduled in

the case are "questionable" debts owing to friends or relatives of the debtors or to The Kaleidoscope.

Although Sheila listed a total of $17,-887.43 owing to unsecured creditors and Florence listed $660,187.43 in unsecured debts, the court disregarded the "questionable" debts and concluded that even assuming the two estates were forced to honor the specific performance contract, approximately $320,000 in equity in the apartment complex would be realized from the sale and that this amount exceeds the amount needed to pay in full all of the unquestioned unsecured creditors.

The principal issues are: Did the trial court err or abuse its discretion by refusing to permit rejection of the contract? Did the trial court err in disregarding for the purposes of the rejection issue the "questionable" claims against Florence? We conclude that based upon the record before it that the court did err in refusing permission to reject the contract and also in disregarding claims of creditors and reverse.

### Standards Governing the Court's Power to Approve or Disapprove Rejection of Executory Contracts

11 U.S.C. § 365(a) provides, in part, that the trustee, subject to court approval, may assume or reject an executory contract of a debtor.

At 2 Collier on Bankruptcy (15th Ed.) ¶ 365.03 (365–14) the editors state:

> There are several schools of thought concerning the standard to be applied in rejecting an executory contract. The rationale is often based in a rather haphazard way upon the nature of the contract in question.... [T]he concept of rejection of executory contracts had its roots in the principle that the trustee might abandon burdensome property. From this has grown one view that for the trustee to reject an executory contract, the contract must in fact be burdensome, *i.e.,* involve some loss or detriment to the estate. What, however of the situation where the contract, while profitable or generally beneficial, could be, if rejected, replaced by a more attractive arrange-

ment? The leading case is unquestionably *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. Co.,* 318 U.S. 523 [63 S.Ct. 727, 87 L.Ed. 959] (1943), which is the strongest statement of the "business judgment test."

The trial court held that it was not necessary for it to determine whether the "business judgment" or "burdensome" test should apply because it concluded to permit rejection under either test would, under the circumstances, violate fundamental principles of fair dealing and give the debtors a windfall.

■ We believe the "business judgment" rule is the standard which controls the court's right to disapprove the trustee's decision to reject an executory contract. In relying upon grounds of "fairness" to the party whose contract is rejected the trial court erred.

The great weight of modern authority holds that whether an executory contract should be rejected is a matter within the business judgment of the trustee. *Matter of Tilco,* 558 F.2d 1369, 1372 (10th Cir. 1977); *King v. Baer,* 482 F.2d 552, 557 (10th Cir. 1973), *cert. den.,* 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473; *Matter of Minges,* 602 F.2d 38, 42–43 (2d Cir. 1979). Virtually all recent Bankruptcy Court decisions follow this rule. *In re Hurricane Elkhorn Coal Corp. II,* 15 B.R. 987, 989 (Bkrtcy.W.D.Ky. 1981); *In re Summit Land Co.,* 13 B.R. 310, 314–15 (Bkrtcy.Utah 1981); *In re J.H. Land & Cattle Co., Inc.,* 8 B.R. 237, 238–39 (Bkrtcy.W.D.Okla.1981); *In re Lafayette Radio Electronics Corp.,* 8 B.R. 528, 533 (Bkrtcy.E.D.N.Y.1981).

We believe rejection of the burdensome test in favor of the "business judgment" rule is dictated by logic as much as by precedent. We agree with Professor Krasnowiecki's view of the burdensome test:

> Whatever the support for that view, it does not seem to be too persuasive. The purpose of the power to reject is to augment the estate of the debtor. For this purpose, there seems to be no difference between an obligation which consumes

cash, and an obligation which, because of its depressive effect on a particular asset or because of its undervaluation of that asset consumes a part of the value of that asset. In the end the latter will turn up as a net reduction in cash to pay the creditors.

Krasnowiecki, *The Impact of the New Bankruptcy Reform Act on Real Estate Development and Financing,* 53 Am.Bankr.L.J. 363, 382 (1979).

In short we find little judicial or logical support for the restrictive burdensome test and therefore cannot sustain the trial court's decision on the grounds that the contract with Pierce is not "burdensome."

*Nature of the Business Judgment Test*

■ What are the standards that are to guide the court and trustee in exercising their "business judgment?" Stated differently: What are the criteria which the court and trustee should legitimately consider in exercising their "business judgment?" The primary issue is whether rejection would benefit the general unsecured creditors. This may involve a balancing of interests. In *Matter of Minges,* 602 F.2d at 43, the Second Circuit noted the need for a flexible test, stating that, "the trustee and ultimately the court, must exercise their discretion fairly in the interest of all who have had the misfortune of dealing with the debtor." This statement illustrates that it is proper for the court to refuse to authorize rejection of a lease or executory contract where the party whose contract is to be rejected would be damaged disproportionately to any benefit to be derived by the general creditors of the estate as for example where most of the "benefit" of rejection of the contract would be captured by a third party at the expense of the unsecured creditors. This statement does not sanction rejection of a contract because of a generalized concern that a party whose contract is rejected will be damaged. The *Minges* court evidenced its view that "benefit to the unsecured creditors" was the primary concern by remanding the case for findings on whether in the trial court's judgment there was "a reasonable likelihood that general creditors will derive substantial or significant benefit from the proposed lease rejection." 602 F.2d at 44.

We now consider the application of these principles to the attempt to reject the contract with Pierce.

*Application of the Business Judgment Test to Pierce's Contract .*

We do not view "principles of fair dealing" as a standard independent of the "business judgment" test. The trial court relied upon two underlying notions to support its view that to grant permission to reject the contract would work an injustice inconsistent with the intention of § 365(a). The first is that it is somehow unfair to Pierce to force him to give up the benefits of the appreciation in value of the apartment complex. The second and more important notion is that to permit rejection in this case would be unfair because it would result in a windfall to the debtors and their friends and relatives who hold "questionable" claims against the estate.

*Unfairness of Rejecting Real Estate Sales Contracts*

■ The fact that the expectations of a vendee are disappointed is not sufficient grounds standing alone to deny the trustee permission to reject. Any rejection will inevitably entail the disappointment of legitimate expectations. A basic policy of the Bankruptcy laws is to spread the burdens evenly among both those who may have loaned the debtor money and those who might have obtained a profit from dealing with him.

While it may seem inequitable to Pierce that he is deprived of the anticipated profit in the form of appreciation in value of the complex in favor of the other unsecured creditors of the estate, this result is required by well defined Bankruptcy policies. *Compare In re New York Investors Mutual Group, Inc.,* 143 F.Supp. 51 (D.S.D.N.Y. 1956); *In re Philadelphia Penn Worsted Co.,* 278 F.2d 661 (3d Cir. 1960); *and Gulf Petroleum, S.A. v. Collazo,* 316 F.2d 257 (1st Cir. 1963) *with* 11 U.S.C. §§ 365(h), 365(i). To the extent the trial court's decision in re-

fusing to authorize rejection of the contract relies upon Pierce's claim of unfairness, it is not consistent with the "business judgment" rule because it gives insufficient weight to the benefit accruing to the unsecured creditors arising from the rejection.

### Whether The Debtors or Creditors Would Primarily Benefit from Rejection

The trial court's fundamental reason for declining to approve the proposed rejection was its conclusion that, "the primary beneficiaries of rejection would be the debtors, not creditors, and that is not a proper use of the rejection device." Thus, although it disclaimed any need to choose between the "burdensome" or "business judgment" tests, it applied the primary criterium of the "business judgment" test, benefit to the creditors. We hold that it did so incorrectly. It apparently viewed its conclusion as a corollary to its finding that:

> Sale of the Caroline Apartments to Pierce, pursuant to the terms of the contract, would provide Florence and Sheila Huang with net proceeds of approximately $320,000.00. This amount exceeds the amount needed to pay in full all of the unquestioned unsecured creditors of Florence and Sheila Huang.

*Appellant's Excerpts of Record* at 45.

The conclusion that the debtors would be the primary beneficiaries of rejection and that rejection is therefore improper does not flow from the quoted findings for two reasons.

### Exclusion From Consideration of Questioned Claims

First, by excluding the "questioned" claims from the computation, the court implicitly assumes that the claims of the "questioned" unsecured creditors are (1) invalid, or (2) that any benefit accruing to the friends and relatives of the debtors who hold those claims inures vicariously to the benefit of the debtors. Neither of these implicit assumptions is warranted.

Although some evidence was taken at the time of the hearing on rejection relating to the various "questioned" claims, none of the holders of those claims had notice of, or were represented at the hearing. Florence and Sheila have personally guaranteed certain debts owed by Kaleidoscope, but the trial court has made no findings regarding the solvency of Kaleidoscope or the amount of any claim against the debtors with respect to Kaleidoscope obligations guaranteed by them. The failure to make findings regarding the Kaleidoscope related claims leaves in doubt whether the trial court considered those claims as "questioned" and if not whether it excluded them in reaching its conclusion that enough equity was available to pay the unsecured creditors. Under 11 U.S.C. § 1111 and Interim Rules 3001(a), and 3001(b)(4) the scheduling of a claim or the filing of a proof of claim in a Chapter 11 case is prima facie evidence of the validity and amount of a noncontingent liquidated claim. Under 11 U.S.C. § 502(a), a claim is deemed allowed unless objected to.

■ In light of these rules and the nonparticipation of the "questioned" creditors it was improper for the court to base its conclusion on the presumed invalidity of some of the claims against the estate. This is particularly so where the disapproval of the rejection request may have, depending upon the quantity of "questioned" claims ultimately allowed, a substantial effect on the net payout percentage to unsecured creditors. We also note that to the extent the "questioned" claims are ultimately allowed, the unquestioned claimants would be forced to accept a reduced payout.

■ Allowable claims of friends and relatives of the debtors are not given an inferior priority to all other unsecured claims. Title 11 U.S.C. § 502(b)(5) limits allowable claims by insiders for services to the reasonable value of such services. By implication in all other respects, allowable claims of insiders should be treated as any other claim would be in the absence of inequitable conduct by them. *See In re Branding Iron Steak House,* 536 F.2d 299 (9th Cir. 1976). To the extent friends or relatives hold allowable unsecured claims, they are entitled to share in any enhanced value of the estate resulting from rejection of an executory contract with all other unsecured creditors.

■ Of course in determining whether a claim is allowable, the court may consider all relevant evidence, including the relationship of the parties. While some of the claims may appear open to question, it is not so self-evident that the claims could be disregarded without a hearing. We do not suggest that the court might not have temporarily refused to permit rejection pending consideration of the allowability of the "questioned" claims. Nor do we suggest that more summary treatment of the problem might not have been allowable if exigent circumstances had dictated. Here there were no such circumstances. Given the potential prejudice to holders of both "questioned" and unquestioned claims, the decision without a hearing on notice to the parties concerned, was improper.

### Vendee's Damages

■ The debtors cannot directly become the primary beneficiaries of rejection either. Rejection of the executory contract by Pierce in this case would permit the estate to reap the benefits of the appreciation in value that has occurred in the three years since the contract was signed. Under 11 U.S.C. § 365(g) the rejection of the executory contract would be treated as a breach of the contract and would entitle Pierce to present a claim against the estate for damages, presumably including the appreciation in value of the property. In effect the appreciation would be divided equally among all unsecured creditors including the vendee whose contract is rejected. The result is similar to the recovery of a preferential transfer or the voiding of a lien on property of the estate.

■ If without regard to rejection of the contract, the estate is solvent and the unsecured creditors would receive 100 percent of their claims, rejection would then accomplish nothing for the general unsecured creditors. We do not doubt that if in the judgment of the bankruptcy court, an estate is solvent in the sense that a 100 percent payout will occur in the event of liquidation, that it is within the discretion of the court to decline to authorize rejection of a contract on the grounds that no benefit would accrue to the creditors from the rejection. In such circumstances, rejection might only impose unwarranted administrative expenses or delay.

■ However it is not true that solvent debtors may petition for bankruptcy and then obtain a windfall by rejecting their executory contracts as was argued by Pierce. Such a view ignores the fact that in the event of liquidation the party whose contract is rejected must have his claim satisfied before the debtor may obtain recovery. See 11 U.S.C. § 726. In the case of reorganization, the "best interests of the creditors" test gives the creditor equal advantage. See 11 U.S.C. §§ 1123–24, 1129.

The debtors thus cannot become the primary beneficiaries of rejection directly.

### Treatment of Each Estate Separately

The trial court failed to apportion the equity in the apartment complex available to each estate. Assuming that it was correct in concluding that the sale of the complex would generate proceeds of approximately $320,000, and assuming this sum is sufficient to pay all allowable claims of both debtors, the conclusion does not follow that both estates are solvent. Except to the extent creditors have joint claims against both debtors, Sheila's creditors cannot reach Florence's equity and vice versa.

### Conclusion

For the foregoing reasons the decision is, REVERSED and REMANDED for further consideration in accordance with this opinion.