**In re Moses N. ASLAN, Debtor.**

**Bankruptcy No. LA 86–03637–GM.**

United States Bankruptcy Court, C.D. California.

Sept. 5, 1986.

Martin J. Brill, Leslie A. Cohen, Robinson, Wolas & Diamant, Los Angeles, Cal., for debtor.

Steven P. Tapia, Loeb & Loeb, Los Angeles, Cal., for creditor, Sycamore.

Jay S. Bulmash, Seal Beach, Cal., for creditor, Amana Corp., assignee of American Development.

Steven Snipper, Arak, Welter, Snipper & Greene, Los Angeles, Cal., as special counsel.

Edythe Bronston, Cox, Castle & Nicholson, Los Angeles, Cal., for creditor Siavoush Safaie-Kia.

Peter Bronson, Levy & Norminton, Los Angeles, Cal., for Hongkong & Shanghai Banking Corp.

Roy Zuckerman, McKay & Zuckerman, Long Beach, Cal., for creditor Cent. Bank.

Barbara Dohrmann, Los Angeles, Cal., for creditors Jane C. Williams and Westwood Center Corp.

Patrick Smith, Los Angeles, Cal., for U.S. trustee.

## MEMORANDUM OF OPINION RE MOTION TO REJECT EXECUTORY CONTRACT

GERALDINE MUND, Bankruptcy Judge.

On or about April 13, 1982, Moses Aslan and Sycamore Investment Company ("Sycamore") entered into a real estate purchase contract whereby Sycamore agreed to purchase the "Broadway Spring Arcade Buildings" (the "Arcade"). This agreement was amended a few days later to, among other things, increase the purchase price to $4,500,000.00.

The agreement between the parties called for Aslan to deliver to Sycamore copies of leases, verbal tenancies, warranties, etc. within 10 days after the opening of the escrow. The escrow was to have opened on or before April 27, 1982 and was to have closed contingent upon Sycamore's review of the documents that it received. The escrow opened as scheduled, but Aslan only delivered part of the required documents and the escrow never closed.

On September 19, 1983, Sycamore filed a complaint for breach of contract and specif-

ic performance in the Superior Court of California, Case No. C 468496. In conjunction with that case, Sycamore filed a Notice of Action Pending, which is recorded with the County Recorder. This gave Sycamore a priority position on the building, should they prevail on their state court action for specific performance.

Aslan has vigorously defended this case in the state court, seeking to be relieved of any obligations under the purchase agreement. Prior to the filing of this bankruptcy, no resolution of the state court action had occurred.

The current case was filed on March 3, 1986, as a debtor-in-possession Chapter 11. Aslan sought to reject the purchase agreement. Thereafter, a trustee was appointed and the trustee has now joined the motion to reject the executory contract.

■ There was dispute as to whether this contract is truly executory. The key case in issue is the Ninth Circuit decision of *In re Alexander*, 670 F.2d 885 (9th Cir. 1982). The *Alexander* court held that the fact that the buyer had not yet paid the remainder of the purchase price for the real property and that title had not actually been conveyed by the seller left the contract sufficiently unperformed so that it remained executory.

Sycamore argues that no other courts (including later opinions of the Ninth Circuit) have followed Alexander. This does not appear to be the situation. While this Court also has trouble with the concepts expressed in Alexander, for it seems to say that unless the escrow has actually closed the contract is executory, it is the law of the Ninth Circuit and is binding upon the case before this Court. Therefore the Court finds that the contract in question is an executory contract and falls under the provisions of 11 U.S.C. § 365.

The Trustee argues that, since it appears that a higher price will be received for the building if it is now able to be sold, the "business judgment test" should allow him to reject the contract without further review by the Court. The Court believes that it first must determine the effect of rejection on the Specific Performance Action. If the rejection would transform the equitable remedy of specific performance into a monetary claim, it then must decide whether the business judgment test authorizes rejection.

Therefore the initial issue is whether rejection of an executory contract, where state law allows a remedy of specific performance, relieves the debtor/trustee from the requirement to specifically perform the contract. In other words, if the Court were to allow rejection of the contract, would the result be that Sycamore is left only with an unsecured pre-petition claim or would the result be that Sycamore (upon obtaining relief from the automatic stay) could go forward and obtain a state court judgment for specific performance and enforce that judgment against the estate? [1]

The present case requires the Court to determine the congressional intent concerning the effect of rejection of a contract when state law allows a breach of contract to be remedied by specific performance. To that end the Court has delved deeply into the legislative history of the Bankruptcy Code and its various provisions and has taken the following analytical path:

11 U.S.C. § 365(g) states that rejection of an executory contract constitutes a breach of that contract immediately before the date of filing of the petition. This provision does not deal with the remedies involved, but establishes the time that the breach is deemed to have occurred.

11 U.S.C. § 1141(d) states that in Chapter 11, confirmation discharges the debtor

---

1. The issue of rejection of executory contracts recently came before me in the case of *In re Carrere*, 64 B.R. 156 (Bankr.C.D.Cal.1986), in which I ruled that a personal services contract does not become property of the estate in Chapters 7 and 11 and therefore cannot be rejected. At the end of that opinion I questioned whether

rejection of contracts would transform an equitable remedy for specific performance into a claim for money, which could then be discharged. The opinion in the instant case modifies any comments that I made concerning the effect of rejection on a non-personal services contract in which equitable relief is sought.

from any "debt" that arose before the date of confirmation and from any "debt" of the kind specified in 11 U.S.C. §§ 502(g), 502(h), or 502(i). Therefore, if the breach described in § 365(g) creates a "debt" of the kind included in § 1141(d), that "debt" is discharged at time of confirmation.

11 U.S.C. § 502(g) specifies that a "claim" arising from rejection of an executory contract shall be determined and allowed under §§ 502(a), 502(b) or 502(c), or should be disallowed under §§ 502(d), or 502(e), as if such claim had arisen before the date of filing of the petition. So if the breach of an executory contract creates a "claim," it is discharged under § 1141(d).

Up to this point there are two key words. Section 1141(d) talks about discharge of a "debt." Section 502(g) talks about creation of a "claim."

11 U.S.C. § 101(11) defines the term "debt" to mean a liability on a claim.

11 U.S.C. § 101(4)(B) defines a "claim" in the case of an equitable remedy to exist only if the breach of performance gives rise to a right of payment.[2] Nowhere in the definition of claim does it include an equitable remedy which does not give rise to a right of payment.

Having followed this analytical path, the Court must interpret the phrase of § 101(4)(B) as being inclusive or exclusive. Does it mean to include or to exclude as a claim any cause of action which gives rise to a right to payment as an alternative remedy to equitable performance? The debtor and trustee take the position that § 101(4)(B) is inclusive of all causes of action which have an alternative right to payment, even if the choice of remedy would normally be in the control of the non-debtor. Sycamore argues the other position.

In support of its position that rejection of the contract relieves the debtor of any re-

quirement to perform under state law, the debtor cites the case of *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir.1985). Although the facts in *Lubrizol* are very different, for they deal with using technology during the pendency of the lawsuit on breach, the issues are similar in that they require the Court to interpret the effect of an equitable remedy on the existence of a "claim."

This Court agrees with the result in *Lubrizol*, for it holds that the equitable remedy is transformed into a monetary claim. However, the Court must respectfully disagree with the *Lubrizol* reasoning, for it is based upon H.R.Rep. 95–595, 95th Cong., 2nd Sess. 349 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6305 and does not take into account the later legislative history of the definition of "claim," which is specifically on point.

A summary of the legislative history of the creation of this bankruptcy code is set forth in *Collier on Bankruptcy* (15th Ed. Appendix 2). The bill which came through the House was designated H.R. 8200, 95th Cong., 1st Sess. (1977). It was considered, amended, and reported out of the Committee on the Judiciary in September, 1977. That report was designated H.R.Rep. No. 95–595, and is the one cited by the Fourth Circuit in *Lubrizol*. The text of § 101(4), defining "claim," in the House bill was as follows:

(4) "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach does not give rise to a right to pay-

---

**2.** 11 U.S.C. § 101(4) states:
(4) "claim" means—
(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

ment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured;

The discussion cited in *Lubrizol* is that the House intended a claim to include "an equitable right to performance that does not give rise to a right to payment." (H.R. Rep. 95–595, p. 309, U.S.Code Cong. & Admin.News 1978, p. 6266).[3]

Some amendments were made to H.R. 8200 and it was passed by the House and sent to the Senate on February 8, 1978.

Meanwhile the Senate was working on its own bill, S. 2266, 95th Cong., 2d Sess. (1977) which was favorably reported on July 14, 1978 and was accompanied by its own comments. The bill passed by the Senate defines a "claim" as follows:

(4) "claim"—

(A) means right to payment, other than of an expense allowable under section 503, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; and

(B) includes, except where specifically provided otherwise, interest thereon provided by law or contract.

The Senate version does not discuss equitable rights under the definition of claim and makes it clear that a claim must be a right to payment. The Senate passed its version on September 22, 1978.

Thereafter there were a series of conferences to work on the differences in the two bills that had been passed. A compromise was reached and the bill was passed by both Houses of Congress in October, 1978 and sent forward to the White House.

The compromises that were reached were reported in the Congressional Record. 124 Cong.Rec. H11090 (daily ed. Sept. 28, 1978) discusses the modification of § 101(4)(B). It states as follows:

Section 101(4)(B) represents a modification of the House-passed bill to include [in] the definition of "claim" a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment. This is intended to cause the liquidation or estimation of contingent rights of payment for which there may be an alternative equitable remedy with the result that the equitable remedy will be susceptible to being discharged in bankruptcy. For example, in some States, a judgment for specific performance may be satisfied by an alternative right to payment, in the event performance is refused; in that event, the creditor entitled to specific performance would have a "claim" for purposes of proceeding under title 11.

On the other hand, rights to an equitable remedy for a breach of performance with respect to which such breach does not give rise to a right to payment are not "claims" and would therefore not be susceptible to discharge in bankruptcy.

The identical language was put forth in the Senate record, 124 Cong.Rec. S17406 (daily ed., Oct. 6, 1978).

■ Therefore it is clear that the final version, as passed and signed into law, is intended to include as a claim a right to an equity remedy for breach of performance *if the breach gives rise to an alternative right to payment.* If the *only* remedy

---

**3.** The Fourth Circuit states that the legislative history "makes clear that the purpose of the provision is to provide only a damages remedy for the non-bankruptcy party." The operative language that the Fourth Circuit is depending on in the House bill is "right to an equitable remedy for breach of performance *if such breach does not give rise to a right to payment* ..." The final version of the Code uses the phrase "right to an equitable remedy for breach of performance *if such breach gives rise to a*

right to payment...." It is clear that the House intended that a claim would be all-inclusive and that if there was a right to payment, that would be included in § 101(4)(A) and that other equitable remedies would be included in § 101(4)(B). In this, the Fourth Circuit is correct that the House of Representatives intended there to be only a damages remedy for the non-debtor party. However, the operative language in the House bill was changed in the final version of the Code.

allowed by law is non-monetary, the equitable remedy is not transformed into a claim and it survives the rejection of the executory contract.

The question to be dealt with is whether, as a matter of state law, the non-breaching party to the contract has a right to obtain a money judgment, even though he also has a right to obtain an equitable judgment. If so, the remedy becomes a contingent claim and can be discharged in the bankruptcy.

There are certain cases in which no money damages can be awarded. For example, if the plaintiff is seeking to enforce his right to vote on a Board of Trustees, no amount of money can take the place of that right and that right cannot be estimated by the Court in terms of dollars so as to create a contingent claim. Because this is not the type of judgment which can be converted into money, it is not a "claim" under the Bankruptcy Code and cannot be discharged upon rejection of the contract. Therefore rejection of such a contract would not be possible and the statutory scheme of § 365 would not apply.[4]

In the case of transfer of real property, specific performance is allowed because courts have felt that real property is unique and that a money judgment cannot fully equate to the property itself. However, the law does allow the creditor to choose between receiving money and receiving specific performance.

Damages for rejection of an executory contract become a claim dischargeable in the bankruptcy only if under state law the creditor would have the choice of more than one possible remedy, with one of the choices being a money claim. The filing of the bankruptcy and the rejection of the contract under the bankruptcy shifts the choice of remedy from one which is solely in the hands of the creditor to a choice by the debtor, upon approval of the Court. Thus, in California, an executory contract

for sale of real property can be rejected and the potential action for specific performance will be transformed into a pre-petition claim, which may be discharged in the bankruptcy.

However, before rejection actually can occur, the Court must determine whether it should be allowed. The Court must look at the harm to this creditor, weigh it against the benefit or harm to other creditors, and look at the potential harm to the debtor. *In re Huang*, 23 B.R. 798 (Bankr. 9th Cir.1982). Good faith plays a part in this weighing, as is shown by the recent opinion of *In re Chinichian*, 784 F.2d 1440 (9th Cir.1986). In *Chinichian* the Court found that the bankruptcy was filed for the sole purpose of preventing consummation of the state court's specific performance judgment and that no one except the debtors would benefit from the rejection of the contract. Therefore rejection was not allowed.

This is not the situation concerning the Arcade Building. There are consentual and judgment liens junior to Sycamore's interest, there is potential value of $8 Million for the property, and there are other properties. Some of the liens on the Arcade Building are cross-collateralized by other property. By selling the Arcade Building for $8 Million, liens would be removed from other properties of the estate which could then be sold to generate sufficient monies to pay all creditors in full, including the "claim" of Sycamore.

Therefore the Court finds that the trustee's application to reject meets the requirements of the business judgment test and approves rejection upon receipt of a minimum cash bid of $8 Million at a publicly noticed auction or some equivalent offer or refinance that values the property at $8 Million or more.

---

4. The Court is also aware of a possible situation where rejection of the contract and discharge of the claim would be in contravention of a state statute that is meant to protect public health. In such a situation it is probable that the reasoning of *Mid-Atlantic National Bank v. New Jersey*

*Department of Environmental Protection*, —— U.S. ——, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) would apply and would at least require the Court to condition the rejection on certain acts that would help to accomplish the state purpose.