**IN RE: John Edward HERTZ and Diane Gamroth Hertz, Debtors and Debtors in Possession.**

**Case No.: 2:15–bk–12813–DS**

United States Bankruptcy Court, C.D. California, **Los Angeles Division.**

Signed September 8, 2015

---

Stella A. Havkin, Havkin & Shrago, Woodland Hills, CA, for Debtors and Debtors in Possession.

## MEMORANDUM DECISION ON THE DEBTORS' MOTION TO REJECT EXECUTORY CONTRACT WITH THE GRAYFOX TRUST PURSUANT TO 11 U.S.C. § 365(a)

Deborah J. Saltzman, United States Bankruptcy Judge

Debtors and debtors in possession John Edward Hertz ("Hertz") and Diane Gamroth Hertz (together with Hertz, the "Debtors") move for an order (the "Motion," Docket No. 68) approving rejection of a real estate purchase contract between the Debtors and The Grayfox Trust Dated March 1, 2004 (the "Trust") for the property located 28754 Grayfox Street, Malibu, California 90265 (the "Property").

### I. BACKGROUND

The Debtors listed the Property for sale in January 2014 through real estate broker Chris Cortazzo ("Cortazzo") of Coldwell Banker Residential Brokerage Co. ("Coldwell") at an initial price of $7,850,000. Declaration of Christopher Cortazzo, attached to the Trust's opposition to the Motion, Docket No. 79 ("Cortazzo Decl."), ¶ 6. The Debtors had previously reached out to Cortazzo for evaluation of the Property in 2008 and 2012. In December 2008,

Cortazzo wrote in response to a request from the Debtors that he believed that the market value of the Property was approximately $8,500,000. Declaration of John Hertz, attached to the Motion, Docket No. 68 ("Hertz Decl."), ¶ 9, Ex. 3. Cortazzo responded to another request by letter in April 2012, at which time he stated his belief that the Property could acquire a sale price between $8,000,000 and $8,500,000. Hertz Decl. ¶ 9, Ex. 4.

On June 26, 2014, The Trust made an offer to purchase the Property. Cortazzo Decl. ¶ 13. After a series of counteroffers were exchanged by the parties, on July 3, 2014, the Trust accepted a counteroffer pursuant to which the sale price was $6,850,000 and the Debtors would have a one-year leaseback, with an option for a second year on mutual agreement (the "Purchase Contract"). Hertz Decl. ¶ 2; Cortazzo Decl. ¶ 13. The escrow holder was Terra Coastal Escrow, Inc. ("Escrow"), whose lead escrow officer for the transaction was Stephany Keith ("Keith"). Declaration of Stephany Keith in Support of Motion for Relief from Stay—Action in a Non–Bankruptcy Forum ("Keith Decl."), Docket No. 57–2, ¶ 2.

Escrow opened on July 9, 2014, when the Purchase Contract was provided to Escrow. The Debtors and the Trust each signed a copy of Supplemental Instructions & General Provisions governing the terms of escrow. Keith Decl. ¶ 3, Ex. A. In August 2014, following disclosures by the Debtors, the Trust removed all contingencies under the Purchase Contract. Cortazzo Decl. ¶ 17; Declaration of Victor Meschures in Support of Motion for Relief from Stay—Action in a Non–Bankruptcy Forum ("Meschures Decl."), Docket No.

37–5, Ex. 1, ¶ 6. Escrow issued amended escrow instructions, dated August 12, 2014, confirming the removal of contingencies, reducing the price to $6,840,000, and setting closing for August 29, 2014 or sooner, if possible. Keith Decl. ¶ 4, Ex. B. Keith prepared and sent two more escrow instructions, both dated August 27, 2014, that authorized Escrow to pay certain amounts from the Trust's funds and other amounts from the Debtors' proceeds, each of which was executed by the relevant parties. Keith Decl. ¶ 5, Exs. B & C. In further preparation for closing, Keith had the Debtors execute a grant deed, but as Escrow did not close, it has not been recorded. Keith Decl. ¶ 7, Ex. D.[1]

A preliminary title report on the Property reflected several encumbrances. Hertz Decl. ¶ 3, 5; Keith Decl. ¶ 8. Keith sought and received payoff demands and release documents for the monetary encumbrances shown on the title report by late September 2014. Keith Decl. ¶¶ 8–9. On September 15, 2014, the Debtors sent a letter to Keith instructing her not to close the sale until they had "signed the demands of" lienholding creditors Tom Block, Hardy Thomas, and Paula Zanay. Keith Decl. ¶ 9, Ex. E. Craig Morse ("Morse"), acting on behalf of the Debtors, also advised Coldwell, through its employee Lily Harfouche ("Harfouche"), that the sale could not close because of liens and a *lis pendens* against the Property. Declaration of Craig Morse, attached to the Motion ("Morse Decl."), ¶ 3; Declaration of Lily Harfouche in Support of Motion for Relief from Stay—Action in a Non–Bankruptcy Forum ("Harfouche RFS Decl."), Docket No. 57–4, ¶ 8; Meschures Decl. ¶¶ 8–9. According to Harfouche, Morse provided

---

1. Keith's declaration states that "John and Diane Hertz" signed the grant deed, and that Keith was the notary. Although the grant deed attached to the Keith Declaration has what appears to be a signature of Diane Hertz, Diane Hertz's name is struck through in the notary block.

her with updates on the status of the Debtors' negotiations with the lienholders, and at one point indicated to her that he thought the sale would be ready to close very soon. Harfouche Decl. ¶¶ 8–9. According to Morse, in response to a third request to Harfouche that the Trust not wire the balance of the sale price into Escrow, Harfouche told Morse that the Trust wired the funds into escrow despite the Debtors' request. Morse Decl. ¶ 3.

On September 30, 2014, the Trust deposited the balance of the purchase price into Escrow. Hertz Decl. ¶ 12; Meschures Decl. ¶ 10; Keith Decl. ¶ 10. Harfouche and Morse discussed the deposit on or about September 30, 2014. Harfouche states that she and Morse discussed an extension fee of $3,000 per day if Escrow did not close by October 1, 2014, and that Morse stated that the amount was not a sufficient incentive for the Debtors, but that Hertz was also on the call, and agreed to the $3,000 daily fee. Harfouche RFS Decl. ¶ 10. Morse and Hertz characterize the fee differently, stating that the Trust "demanded" the payments. Hertz Decl. ¶ 12; Morse Decl. ¶ 3. Escrow prepared an amended instruction, dated September 30, 2014, providing for an extension of Escrow beyond October 1, 2014, conditioned on the $3,000 daily fee, but the amendment was never executed by the Debtors. Hertz Decl. ¶ 12, Ex. 6; Harfouche RFS Decl. ¶ 10.

On October 8, 2014, the Trust sent Debtors a "Demand to Close Escrow," demanding that the Debtors close and transfer title to the Property within three days. After the Debtors did not comply, on October 29, 2014, the trustees of the Trust filed a complaint in California Superior Court for specific performance of the Purchase Contract. Complaint for [1] Breach of Written Contract—Specific Performance; and [2] Breach of Written Contract—Damages, attached as Ex. 1 to the Trust's motion for relief from stay, Docket No. 37. A hearing on the Trust's motion to compel arbitration of the dispute pursuant to an arbitration provision of the Purchase Contract was set for March 10, 2015. The Debtors filed their chapter 11 petition on February 25, 2015, the day their opposition to the motion to compel arbitration was due in Superior Court.

Following the Debtors' bankruptcy petition, the Trust filed a motion for relief from stay, seeking an order (1) declaring that the Purchase Contract could not be rejected, and (2) granting relief to the Trust to continue to prosecute the state court action (Docket No. 37). Because that motion was premature in light of the Debtors' right to seek to reject the Purchase Contract, the motion for relief from stay was continued until the instant Motion could be filed and heard.

On May 14, 2015, the Debtors filed the Motion to reject the Purchase Contract, arguing that it is an executory contract that they may reject under 11 U.S.C. section 365(a), and that such rejection is in the interests of their estate and its creditors. In support of their argument that the Purchase Contract is executory, the Debtors list nine matters that they claim establish that neither they nor the Trust has fully performed: (1) the escrow closing statement has not been executed by the Debtors; (2) the Trust has not authorized Escrow to transfer funds; (3) the Trust has not waived the condition that the Debtors deliver clean title; (4) the validity of the grant deed executed by the Debtors is in question because it was executed by John Hertz under pressure from the Trust and Escrow, and was not signed by Diane Hertz on the stated date; (5) there may have been fraud in the inducement in the form of self-dealing by Cortazzo; (6) Cortazzo did not market the Property well,

and had previously told the Debtors that their home was worth $8,000,000 to $8,500,000; (7) a different real estate broker has provided the Debtors with a listing agreement with a list price of $7,999,999 for the Property; (8) Cortazzo hid the identity of the Trust's beneficiary from the Debtors, which was material to the lease-back and the price the Debtors would have been willing to accept, had they known her identity; and (9) the Purchase Contract "could have been terminated" by the escrow amendment providing for a $3,000 daily fee to extend the closing date beyond October 1, 2014. Motion at 4–7. The Debtors also ask the court to take judicial notice "that in the past year, the real estate market in the Los Angeles area has significantly increased," and, on that basis, argue that rejection of the Purchase Contract will benefit creditors and the Debtors by allowing the Debtors to re-market the Property and sell it for approximately $8,000,000. Motion at 8. The Debtors note that they are of advancing age and need additional funds that would be realized from a sale other than under the Purchase Contract to purchase a new house and fund their retirement. Motion at 2:19–20, 8:10–12.

Oppositions to the Motion were filed by the Trust, Coldwell, OneWest Bank, N.A. ("OneWest," which holds the first deed of trust on the Property), and creditor Edward A. Hoffman ("Hoffman"). The Trust argued that it has fully performed its obligations, and therefore that the Purchase Contract is not executory. It further argues that rejection would disproportionally harm the Trust, and would not benefit the estate and unsecured creditors, because even if the Debtors could realize a sale price of $8,000,000, the increased proceeds would be diminished by the Trust's claim for rejection damages, additional broker commission, increased interest on the Debtors' mortgage and other debts, capital gains tax, and potential litigation costs. The Trust also argues that the Debtors' bankruptcy filing was not in good faith, providing further grounds for denying the Motion.

The oppositions filed by Coldwell, OneWest, and Hoffman echo the arguments made by the Trust. Coldwell's opposition focuses on what it characterizes as the arm's length negotiations leading to the Purchase Contract. OneWest argues that, based on the Debtors' schedules, the estate is solvent, and therefore rejection of the Purchase Contract based on speculation regarding an alternate sale could only harm creditors and benefit the Debtors. Hoffman expands upon the arguments of the Trust and OneWest, and concentrates on what he characterizes as a lack of evidence that the sale to the Trust is not at a fair market price, or that the Debtors would ever be able to realize the $8,000,000 they claim would be a fair price.

Addressing the opponents' argument that a hypothetical increase in sale price would be diminished by rejection damages owed to the Trust and Coldwell, the Debtors argue in their reply brief that the Trust is bound by its claim that the price under the Purchase Contract is a fair price for the Property, and therefore could not claim as damages the difference between that amount and a future higher sale price. The Debtors also claim that Coldwell and Cortazzo would have no right to damages under their listing agreement with the Debtors because the agreement expired long ago, and only entitles them to commission if the sale to the Trust is consummated. The Debtors further argue that no damages to Coldwell and Cortazzo should be considered in evaluating rejection of the Purchase Contract because the Debtors have sued Coldwell and Cortazzo regarding their conduct with respect to the sale of the Property. With their reply, the

Debtors offer a declaration from yet another broker, Carol Bird, who gives the Property a value of $7,800,000 to $8,000,000 and attaches several documents regarding other properties in the neighborhood for comparison. Declaration of Carol Bird ("Bird Decl."), attached to the Debtors' reply (the "Reply," Docket No. 84), ¶¶ 4, 5. The Debtors also claim in their Reply that an inferior property next door was recently offered for sale and was under contract for $8,000,000. Declaration of John Hertz, attached to the Reply ("Hertz Reply Decl."), ¶ 2; Bird Decl. ¶ 4.

In response, at the hearing on the Motion, the Trust made an offer of proof that the property next door had actually been sold for $6,600,000, not $8,000,000, and later filed evidence thereof. Declaration of Lily Harfouche re Debtors' Motion to Reject Purchase Agreement with the Trust, Docket No. 92, ¶¶ 10, 11, Ex. B. The Debtors responded with claims that even the $6,600,000 price for the adjacent property supports their view of the value of the Property because of the superior condition and landscaping of the Property. Supplemental Declarations of John Hertz and Carol Bird Regarding the Sale of the Property Adjacent to that of the Debtors, Docket No. 95, Declaration of John Hertz ¶¶ 35; Declaration of Carol Bird ("Bird Supplemental Decl.") ¶¶ 3–5.

## II. DISCUSSION

### A. The Purchase Contract is Not an Executory Contract

Within the Ninth Circuit, the "Countryman" definition is generally applied to determine whether, for purposes of section 365, a contract is executory. See *Pacific Express, Inc. v. Teknekron Infoswitch Corp. (In re Pacific Express)*, 780 F.2d 1482, 1487 (9th Cir.1986). Under that standard, a contract is executory if the obligations of both parties to the contract "are so far underperformed that the failure of either would constitute a material breach excusing the performance of the other." Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L.Rev. 439, 460 (1973), *cited in Benevides v. Alexander (In re Alexander)*, 670 F.2d 885, 887 (9th Cir.1982). *See also Commercial Union Ins. Co. v. Texscan Corp. (In re Texscan Corp.)*, 976 F.2d 1269, 1271–72 (9th Cir.1992); *Hall v. Perry (In re Cochise College Park, Inc.)*, 703 F.2d 1339, 1348 (9th Cir.1983); *Collingwood Grain, Inc. v. Coast Trading Co., Inc. (In re Coast Trading Co.)*, 744 F.2d 686, 692 (9th Cir.1984); *Fenix Cattle Co. v. Silver (In re Select–A–Seat Corp.)*, 625 F.2d 290, 292 (9th Cir.1980) (per curiam).

The Debtors rely on the decision of the Ninth Circuit in *Alexander* to argue that the Purchase Contract is executory. In that case, the court considered rejection of a real estate purchase contract between the debtor and a prospective buyer. When the parties entered into the contract, the buyer deposited $1,000 into escrow. *Alexander*, 670 F.2d at 886. On the scheduled closing date, the buyer deposited additional funds into escrow, and had a loan commitment for the balance of the purchase price. *Id.* at 887. Applying the Countryman definition, the Ninth Circuit held that the question of whether the contract was executory turned on whether the buyer had fully performed or merely tendered performance, and found that because the buyer "still had to pay the remainder of the purchase price," it had only tendered performance, leaving the contract executory. *Id.*

The *Alexander* court did not elaborate on the specific facts underlying the distinction between performance and tender of performance, leaving some courts frustrated and confused as to the precedential holding of the Ninth Circuit's decision. In

particular, it is not clear whether the *Alexander* court found that the contract was executory because the buyer's loan had not been funded, or because escrow had not closed. The court in *In re Aslan*, 65 B.R. 826 (Bankr.C.D.Cal.1986), stated that *Alexander* "seems to say that unless the escrow has actually closed the contract is executory," but expressed "trouble" with that concept. *Aslan*, 65 B.R. at 828. While the precise facts of *Aslan* are not clear, based on that court's interpretation of the holding in *Alexander*, it found that a real estate purchase contract remained executory where escrow had not closed due at least in part to the debtor's failure to deliver required documents. *Id.* at 827–28.

Other courts have restated the holding of *Alexander* in similarly broad terms without shedding light on where the *Alexander* court found the distinction between "performance" and "tender of performance" with respect to a buyer's payment under a real estate purchase contract. *See, e.g., In re Owen–Johnson*, 118 B.R. 780, 782 (Bankr.S.D.Cal.1990) (stating that *Alexander* held "that a deposit receipt agreement for the sale of real property is an executory contract where the seller has not conveyed title or surrendered possession, and the buyer, despite a tender of performance, has not paid the remainder of the purchase price," without explaining whether payment of the "remainder of the purchase price" refers to the fact that escrow had not closed, or to additional amounts that had yet to be deposited into escrow); *In re 72 Townsend, LLC*, No. 0933684 TEC, 2010 WL 1689564, at *4 (Bankr.N.D.Cal. April 22, 2010) (noting that *Alexander* held that the debtor's real estate sale contract was executory because the buyer "had not paid the full amount required under the contract," but finding that because the contract at issue was an option contract for which the buyer had already paid through an earlier transaction, the buyer had no material obligations remaining).

At least one court in this circuit has acknowledged the binding authority of *Alexander* as to the distinction between performance and tender of performance, but implicitly rejected the conclusion of *Aslan* that *Alexander* stands for the proposition that a real estate purchase contract remains executory until escrow has closed. *Zeiler v. Matt (In re Matt)*, No. 12–00064, 2013 WL 2250300, at *5 (Bankr.D.Mont. May 22, 2013). In *Matt*, the successful bidders at an auction to sell real property owned by the debtor deposited a non-refundable downpayment with the closing agent, and then, prior to the scheduled closing, signed the necessary documents and deposited certified funds with the closing agent for the remainder of the purchase price. *Id.* at *1–3. The debtor never appeared at the closing agent to sign the closing papers, and eventually filed a chapter 13 petition, indicating his intent to reject the sale agreement. *Id.* at *4. The *Matt* court distinguished these facts from those in *Alexander*, characterizing the buyers' deposit of the down payment and certified funds for the remainder of the price with the closing agent to constitute full performance, not just tender of performance. *Id.* at *5.

The court agrees with the distinction made by the court in *Matt* and declines to read the holding of *Alexander* as broadly as the *Aslan* court thought possible, rendering all real estate sales handled through escrow executory until escrow has actually closed. A narrower reading of *Alexander* is supported by language in the *Alexander* decision. The court stated that the buyer had deposited $1,000 into escrow, and later deposited additional funds, "and had a loan commitment" from a bank

for the balance. *Alexander*, 670 F.2d at 886. In concluding that the buyer had substantially unperformed, the court rephrased the situation, noting that the buyer "still had to pay the remainder of the purchase price." *Id.* at 887. By using "remainder," the *Alexander* court acknowledged that the buyer had already paid some amount—which must have been the $1,000 down payment and additional funds, all of which had been deposited into escrow. The "remainder" then referred to the loan commitment, which, as only a promise of future payment, was only "tender of performance," leaving the contract substantially unperformed by the buyer. The court finds the facts at bar to be similar to those in *Matt*, where the court found that the contract was not executory, and likewise distinguishable from the facts upon which the Ninth Circuit based its decision in *Alexander*. Here, the parties do not dispute that the Trust has deposited the full purchase price into Escrow. Hertz Decl. ¶ 12; Meschures Decl. ¶ 10. The Trust has removed all contingencies under the Purchase Contract. Keith Decl. Ex. B; Meschures Decl. ¶ 6. Although the Debtors argue, as the second item on their list of nine matters that show that neither party has fully performed, that the Trust "had not authorized escrow to transfer of funds," the August 12, 2015 Amended Escrow Instructions—Revised, executed by both the Debtors and the Trust, states that Escrow would close "without further written instruction." As Keith testified, once the Trust wired the remainder of the purchase price to Escrow on September 30, 2014, "no further actions or approvals were required from the Trust in order to close escrow." Keith Decl. ¶ 10. Not one of the other nine items identified in the Debtors' Motion relates to the Trust's performance of its obligations under the Purchase Contract. Other than the second item, rebutted above, only the third even purports to call the Trust's full performance into question by arguing that the Trust had not waived the condition that the Debtors deliver clear title. Aside from the absurdity of the argument that the Trust's failure to excuse the Debtors' performance would constitute the Trust's failure to perform, the Debtors have not pointed to any obligation of the Trust to provide such a waiver, much less established that the Trust's failure to do so would "constitute[ ] a material breach" and therefore leave the Purchase Contract executory. *Alexander*, 670 F.2d at 887. Because the Trust has fully performed its obligations, the Purchase Contract is not executory.[2]

## B. Even if the Purchase Contract were Executory, Rejection is not in the Best Interests of Creditors

If it is not in the best interests of the bankruptcy estate to assume an unexpired

---

**2.** The court further notes that the Debtors' interpretation of *Alexander*—that a real estate purchase contract remains executory so long as escrow has not closed—is inconsistent with California law, which provides for specific performance of an agreement to transfer real property. See, e.g., Cal. Civ. Code. §§ 3384, 3387. Under the California Civil Code, a plaintiff who has substantially performed, or whose substantial performance is assured or secured, may obtain specific performance from a defendant. Cal. Civ. Code § 3386. *See also* Cal. Civ. Code. § 3392. Reading Countryman together with the Debtors' interpretation of *Alexander,* an otherwise fully performing purchaser would have "so far underperformed" that the seller's performance would be excused, yet that same purchaser might be entitled to specific performance from the seller under California law. It would be a bizarre result if any California seller from whom specific performance could be compelled could nonetheless reject the contract simply because escrow had not closed.

lease, the trustee may reject it. 11 U.S.C. § 365(a). Formal rejection of an unexpired lease, as opposed to "deemed rejection" or rejection by operation of law, requires court approval pursuant to a noticed motion. *Id.*

■■■ The propriety of a decision to assume or reject an unexpired lease (*i.e.,* whether the motion to assume/reject should be approved by the court) normally is determined under the deferential "business judgment" test. *See Agarwal v. Pomona Valley Med. Grp., Inc. (In re Pomona Valley Med. Grp. Inc.),* 476 F.3d 665, 670 (9th Cir.2007); *Durkin v. Benedor Corp. (In re G.I. Indus., Inc.),* 204 F.3d 1276, 1282 (9th Cir.2000); *Robertson v. Pierce (In re Chi–Feng Huang),* 23 B.R. 798, 800–02 (9th Cir. BAP 1982). The court must presume that the debtor, in deciding to reject, acted "prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *Pomona Valley,* 476 F.3d at 670. The court should approve the debtor's decision unless it is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *Id.*

■■■ The primary question to guide the court in deciding whether a debtor has properly exercised its business judgment is "whether rejection would benefit the general unsecured creditors." *In re Chi–Feng Huang,* 23 B.R. at 801. Rejection should not be allowed where "the primary beneficiaries of rejection would be the debtors, not creditors." *Id.* at 802. "If without regard to rejection of the contract, the estate is solvent and the unsecured creditors would receive 100 percent of their claims, rejection would then accomplish nothing for the general unsecured creditors." *Id.* at 803. In such a case, the court may decline to permit rejection of a

contract, as it would give no benefit to creditors, and may only cause additional delay and administrative expenses. *Id.*

Here, the Trust and other objecting parties argue that rejection of the Purchase Contract is not in the best interests of the estate and unsecured creditors because: (1) the hypothetical $8,000,000 sale is speculative and unsupported by evidence; (2) any increase in sale proceeds will be substantially (if not completely) diminished by rejection damages, costs of sale, increased claims against the estate due to the passage of time before the hypothetical sale, and increased capital gains tax liability; and (3) sale under the Purchase Contract would be sufficient to satisfy all scheduled creditors, and therefore, the Debtors' rejection is an improper attempt to secure more money for their own retirement.

### i. The Debtors Have Not Established that they Can Sell the Property for $8,000,000

■■■ The Debtors' Motion is premised on their assertion that the Property is worth $8,000,000. In some instances, the Debtors argue that the Property was worth $8,000,000 at the time they listed it for sale with Cortazzo and/or at the time they accepted the Trust's offer of $6,850,000; in others, they argue that since they accepted the Trust's offer, the value of the Property has increased, possibly 30% or more in the past year, and is now worth $8,000,000.

In support of the $8,000,000 value, the Debtors offer the following evidence: (1) a December 10, 2008 letter from Cortazzo stating that he believed the market value of the Property was approximately $8,500,000 (Hertz Decl. Ex. 3); (2) an April 13, 2012 letter from Cortazzo stating that he believed the Property "could acquire a sale price between $8,000,000 to $8,500,000 in today's market" (Declaration of John

Hertz, attached to the Debtors' opposition to the Trust's motion for relief from stay, Docket No. 48, ("Hertz RFS Decl."), Ex. 4); (3) a new, unsigned residential listing agreement with a different broker proposing a list price of $7,999,000 (Hertz RFS Decl. Ex. 5); (4) a declaration offered with the Reply from a new broker stating that the Property is worth in the range of $7,800,000 to $8,600,000 (Bird Decl.); and (5) another declaration from the new broker stating that, although the adjacent property recently sold for only $6,600,000, her opinion of the value of the Property is unchanged (Bird Supplemental Decl. ¶ 5).[3]

The letters from Cortazzo are years old, and of no value in establishing a price for which the Property would sell in today's market. The new listing agreement is unsigned and similarly does nothing to establish the actual value or possible sales price. It was only with their Reply, after months of arguing without credible evidence that the Property is worth $8,000,000, that the Debtors finally offered testimony from a broker that the Property may be worth the price they claim it is.

There is simply no reliable evidence properly before the court to establish that the Property would quickly sell in the range of $8,000,000. The Debtors agreed to list the Property with Cortazzo in January 2014 for $7,850,000, and no offers were received for nearly six months. It is clear that the Debtors believe that the Property was worth $8,000,000 when it was listed, yet they fail to explain why they agreed to list the Property for $7,850,000, or acknowledge that it sat for 6 months without offers. Their argument that Cortazzo and Coldwell were self-dealing in connection

with the sale to the Trust does not explain why the Property would not have attracted more showings and offers, had it been appropriately priced.

The only conclusion that can be reached from the evidence presented by the Debtors is that they hope the Property is worth $8,000,000 or more. The Debtors have claimed a value of $8,000,000 and that they would reject the Purchase Agreement since their original schedules were filed on March 11, 2015. However, the Debtors have never offered an appraisal of the Property, yet rely on prices in old solicitation letters from a broker they themselves discredit, and finally offer a declaration from another agent in their Reply.

Tellingly, the Debtors' Reply requested an evidentiary hearing on valuation of the Property. If, at this late stage, the Debtors still have not gathered and presented sufficient evidence to value the Property, and still believe that the Trust offer, received after the Property was on the market for nearly six months, was a "relatively quick sale," it is apparent that the Debtors' decision to reject the contract is based on hope and speculation and is not a decision made "prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *Pomona Valley*, 476 F.3d at 670. The court may deny rejection where the Debtors' decision "is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code...." *Allied Tech., Inc. v. R.B. Brunemann & Sons*, 25 B.R. 484, 495 (Bankr.S.D.Ohio 1982), *quoted in Official Creditors' Committee v. X10 Wireless*

---

3. The Debtors also argued in the Reply and at the hearing on the Motion that the sale of the house next door for $8,000,000 supported their proposed value for the Property. As discussed above, the evidence submitted after the hearing demonstrated that the Debtors were mistaken, and that the property next door sold for $6,600,000. In any event, the sale price of a single different property would not be adequate to establish that the Property would sell for $8,000,000 today.

*Tech., Inc. (In re X10 Wireless Tech., Inc.)*, No. WW–04–1328–PST, 2005 WL 6960205, at *3 (9th Cir. BAP April 5, 2005).

### ii. Any Increased Sale Proceeds Would Be Diminished by Damages and Costs

*Rejection Damages*

The Trust and objecting parties argue that even if the Property does sell for $8,000,000—and thereby yields $1,160,000 more gross proceeds—the increased sale price will not benefit unsecured creditors as a result of the rejection damages due to the Trust.

Should the Debtors be permitted to reject the Purchase Contract, the Trust would be entitled to damages for breach of contract, including any increase between the contract price and value of the Property on the day prior to the Debtors' bankruptcy petition. *See Aslan v. Sycamore Inv. Co. (In re Aslan)*, 909 F.2d 367, 371–72 (9th Cir.1990); *In re Aslan*, 65 B.R. at 830–31; Cal. Civ. Code § 3306. The Debtors concede this point. Reply at 9:21–22. Moreover, pursuant to section 3306 of the California Civil Code, the Trust may be entitled to certain expenses and interest.

Accordingly, even if a higher sales price is achieved, the best possible result for the Debtors would be that they could keep the amount of the increased proceeds that represents any increase in the value of the Property between the petition date and the eventual sale, less any expenses and interest owed to the Trust and other costs discussed below.

*Additional Broker Commission*

The objecting parties further argue that if the Debtors are allowed to reject the Purchase Contract, they will harm the estate by incurring additional liability to a broker in connection with the new sale. It is the position of the Trust that whether the Debtors sell under the Purchase Contract or reject and sell later, they will be liable to Coldwell and Cortazzo for a $342,000 broker commission. Trust's opposition (Docket No. 79) at 18:13–14; Cortazzo Decl. Ex. A. Accordingly, it is the position of the objecting parties that any increase in sale proceeds will also be diminished in the amount of the next broker's commission.

The Debtors argue that the listing agreement with Cortazzo expired, and therefore they will owe no commission to Cortazzo if they reject the Purchase Contract and proceed with a sale through a different broker. It is unclear, based on the argument in their Reply on this point, whether the Debtors also argue that they are not required to pay a commission to Cortazzo in any event.

On the face of the listing agreement, it expired on May 11, 2014. Cortazzo Decl., ¶ 6, Ex. A. None of the parties have offered evidence to the court of an extension of the listing agreement or the provisions pursuant to which the Debtors owe a commission to Cortazzo with respect to the sale of the Trust. If it were true that no commission is owed to Cortazzo, even if the sale to the Trust is consummated, that would make rejection an even worse business judgment, as the Debtors would be turning down a commission-free sale for one that would doubtless involve a commission on the hypothetically higher price.

*Increased Interest and Administrative Expenses*

The objecting parties point out that, in addition to costs directly related to the rejection and a subsequent sale of the Property, rejection of the Purchase Contract would have substantial consequences for the estate due to delay. While it is not possible to know how long it would take to close on the future sale, interest will continue to accrue on the Debtors' mortgage

with OneWest and the claims of other creditors, including secured creditors who claim 18% interest (although the Debtors have filed a counterclaim alleging violation of usury laws in an adversary proceeding brought by these creditors). The estate may also incur increased administrative expenses due to delay, as well as to employ a broker to market the Property and to litigate the motion to approve the sale.

The amount of these additional interest and administrative costs is impossible to calculate. However, the lack of reliable information as to these ramifications of rejection only reinforces the conclusion that the Debtors' decision to reject the Purchase Contract is extremely speculative, and begs the question of how the Debtors could have reached the conclusion that it is in the best interests of the estate when they genuinely do not know how soon and at what price the Property may finally be sold.

*Capital Gains Tax*

The Trust submits that any increased proceeds of sale realized by the Debtors following rejection of the Purchase Contract may be subject to capital gains tax at a rate as high as 37.1%. Trust's opposition at 18:17–19:2. The Debtors disagree, and also object to the Trust's opinion on evidentiary grounds. Reply, at 10:17–23.[4]

The Debtors do not provide any rebuttal evidence. Instead, the Debtors argue that the tax basis is uncertain (due to their failure to file tax returns for several years), and that, after costs of sale and administrative expenses are deducted, it is "possible" that capital gains tax will be "limited." As with the increased interest and administrative expenses, the uncertainties of circumstances leave the court unable to reach a conclusion regarding the measure of increased capital gains taxes

that may apply. The Debtors are likewise uncertain, again calling into question their conclusion that rejection of the Purchase Contract is a prudent decision.

### iii. Only the Debtors Stand to Gain from Rejection of the Purchase Contract

The Debtors are not entitled to reject the Purchase Contract to benefit themselves and not creditors. *Pomona Valley,* 476 F.3d at 670–71. The Trust and other objecting parties calculate, based on the Debtors' schedules and claims filed in this case, that the proceeds of a sale under the Purchase Contract is likely sufficient to pay all of the Debtors' creditors in full. If the Purchase Contract is rejected, unsecured creditors will be left with uncertainty as to when and at what price the Property will be sold, as administrative expenses and interest on secured claims continue to add up. Given the scant evidence to support the hope that the Property will be quickly sold at a substantially higher price, it is clear that the decision to reject was not made with the interests of creditors in mind.

As noted above, "[i]f without regard to rejection of the contract, the estate is solvent and the unsecured creditors would receive 100 percent of their claims, rejection would then accomplish nothing for the general unsecured creditors." *In re Chi–Feng Huang,* 23 B.R. at 803. In such a case, the court may decline to permit rejection of a contract, as it would give no benefit to creditors, and may only cause additional delay and administrative expenses. *Id.*

The Debtors repeatedly mention in their papers that they are nearing retirement, and that an increased sale price would supplement their retirement income. Motion at 2:19–20, 8:10–12; Reply at 4:6–8.

---

**4.** The court overruled the Debtors' evidentiary objection at the hearing.

Rather than rebut the argument that all creditors would be satisfied by the sale to the Trust, the Reply actually supports the argument of the opposing parties. The Debtors' scheduled claims total $5,876,767.43. They assert that several substantial claims will ultimately be much lower than scheduled or claimed; specifically, they state that the claims of Thomas Hardy and Tom Block will be "drastically reduced" due to usurious interest rates (Reply at 3:20–22), that the tax claims of the IRS and FTB will also be "drastically reduced" after returns are filed (Reply at 5:26–6:1), and that the $349,000 claim of law firm Tesser, Ruttenberg & Grossman is disputed (Reply at 6:1–3). Based on the Debtors' own analysis, all claims would be satisfied in full without rejection of the Purchase Contract.

The Debtors fail to make any credible argument that a speculative future sale is better for unsecured creditors than the $6,850,000 sale to the Trust. There is, of course, a very real possibility that the Property will never achieve an increased sale price large enough to make up for the increased expenses and delay associated with rejecting the sale to the Trust. While the Debtors doubtless would like a more secure and comfortable retirement, the court cannot risk creditors' recoveries and allow the Debtors to gamble for a windfall for themselves based only on the hope that the Property will sell more quickly and at a much higher price than just a year ago.

## III. CONCLUSION

For the foregoing reasons, the Motion is DENIED.

The court will enter a separate order consistent with this memorandum.